**Marianne Lawrence HANSON,**
**Appellant–Respondent,**

v.

**Edward Joseph SPOLNIK,**
**Appellee–Petitioner.**

**No. 32A01–9703–CV–79.**

Court of Appeals of Indiana.

Aug. 29, 1997.

Transfer Denied Dec. 17, 1997.

---

Karl L. Mulvaney, Nana Quay–Smith, Bingham Summers Welsh & Spilman, Indianapolis, Jon D. Krahulik, Yosha Krahulik & Levy, Indianapolis, for Appellant–Respondent.

Robert E. Saint, Saint & Courter, Indianapolis, Henry C. Karlson,[1] Indianapolis, for Appellee–Petitioner.

## OPINION

BAKER, Judge.

■ In this highly contentious appeal, we consider whether one parent's animosity and conduct towards another may justify the modification of a joint child custody arrangement. Specifically, appellant-respondent Marianne Lawrence Hanson challenges the trial court's modification of its joint custody decree to award sole custody of the parties' minor child to appellee-petitioner Edward Joseph Spolnik, Jr. and its finding that she was in contempt for violating the court's restraining order. Marianne presents several issues for our review, which we consolidate and restate as follows: (1) whether the evidence was sufficient to support the trial court's finding that a substantial change of circumstances had occurred which justified a modification of custody; (2) whether the trial court unfairly restricted visitation with her child; (3) whether the trial court erred in awarding Edward attorney's fees; (4) whether she was erroneously held in contempt for violating the court's mutual restraining order.

## FACTS[2]

On March 16, 1995, Marianne's and Edward's marriage was dissolved. Pursuant to the parties' dissolution agreement, the trial court awarded them joint legal and physical custody of their four-year-old daughter, M.S. Under the terms of the agreement, Edward retained custody of M.S. for three days per week and Marianne had custody for four days per week. Additionally, all major decisions regarding M.S.'s care, including education, extracurricular activities and medical treatment, were to be made by both parents.

In June of 1995, Marianne started taking M.S. to Michelle Crane, a child psychologist with the Family Counseling Center, because she believed M.S. was anxious and confused about the divorce and the visitation schedule. During the sessions with Crane, Marianne repeatedly indicated that she desired a modification in the child custody arrangement, stating that she suspected Edward of sexually abusing M.S. and that he had a long history of "psych" treatment. After interviewing M.S., however, Crane determined that M.S. was not unduly upset by the visitation schedule and that a modification in the custody arrangement was not necessary at the present time. She did indicate that modification of the visitation schedule might be appropriate once the school year began and that she wanted to talk with Edward about his alleged inappropriate behavior. However, Edward and Crane never met.

Thereafter, on October 13, 1995, Marianne filed a petition to modify custody, claiming that Edward had violated several agreements with her regarding M.S.'s education and attendance at church, that he was completely disabled due to stress and that he improperly allowed M.S. to sleep in his bed. While the petition was pending, Marianne informed

1. Shortly after this appeal was filed, the appellee petitioned for the admission of Professor Henry Karlson pro hac vice. Upon inquiry suggested by the appellant, we discovered that Prof. Karlson has applied for admission pro hac vice before Indiana courts seven times in the last three years. Although Ind.Admission and Discipline Rule 3 does not expressly limit the number of occasions that a member of the bar of another state may petition to appear before our courts, the rule requires disclosure, when petitioning to appear pro hac vice before the trial court, of all pending causes in which the attorney has been permitted to appear. Such a requirement suggests that pro hac vice admission should only be occasionally permitted as a courtesy towards other state bars and not as a continuing practice to avoid membership in our bar or compliance with our disciplinary rules. Although we have admitted Prof. Karlson for purposes of oral argument in the present case, we do not condone the evasion of our rules and strongly suggest that any attorney who desires to appear before our courts on a regular basis apply for admission to the Indiana bar.

2. Oral argument was held in Indianapolis on July 2, 1997.

Crane that Edward had exposed himself to a boy in the bathroom at M.S.'s school and had inappropriately rubbed a medical creme on M.S.'s vagina. She also stated that M.S. had told her that Edward had allowed her to shake his penis. Record at 2677–78. As a result, Crane filed a report with the Boone County Child Protective Services. Marianne also filed a similar report with regard to the same incident. However, Child Protective Services did not substantiate the allegations and subsequently closed its file on Edward.

Tensions between the parties continued to grow throughout the pendency of the modification proceedings. For example, Marianne, in the presence of M.S., accused Edward of disrupting her class and making her cry, told him to go to Hell, indicated that he was going to get AIDS and informed M.S. that she would have to be decontaminated after Edward placed his stocking cap on her head. According to Edward, M.S. also heard Marianne repeatedly call him "Satan" and accuse him of being homosexual. Thereafter, on February 6, 1996, Edward filed a petition for a mutual restraining order, claiming that Marianne had made numerous harassing telephone calls to him with regard to the modification proceedings and requesting that the parties' communication with one another be restricted to visitation issues. The trial court granted the petition for the restraining order the next day.

Nevertheless, Edward and Marianne continued to experience difficulties in their limited communications and with the custody arrangement. In April of 1996, Edward hired a private investigator, Norman Borders, to accompany him as a witness when he exchanged M.S. at Marianne's residence because he believed Marianne "would attempt to fabricate allegations against him." R. at 227. After Edward and Borders arrived to pick-up M.S. on April 12, 1996, Marianne followed them to a local truck stop where Edward drove Borders to his car. Marianne then proceeded to photograph Borders and obtain his license plate number. Later that evening, she left the following message on Edward's answering machine:

You can play this for the Judge because I would gladly be in contempt with you.

You know what, buddy? You've got big time problems. You are traumatizing that little girl, and you're going to court this week, and you'll see what's going to happen to you. And I hope you play this for Bob Saint and all your other goons, because you are in big time trouble.

R. at 2185. Over the next few days, Marianne left several other messages on Edward's answering machine, informing him that future exchanges of M.S. would occur at the truck stop. She also stated that she had contacted the police and that he and Borders would be arrested if they came on her property.

Several days later, Marianne, Edward and Borders met at the truck stop to exchange M.S. Shortly after the exchange, Marianne returned to the truck stop, saw Borders and began to follow his vehicle. In response, Borders began backing his vehicle towards Marianne's car. After blocking Marianne's car and "glaring" at her, Borders drove away. Shortly thereafter, Marianne reported the incident to the police, stating that Borders looked like the unibomber and he could have been a hit man. R. at 2295. She was subsequently informed that Borders was a private investigator.

Following the truck stop incident, Edward and Marianne exchanged M.S. in the parking lot of a local church. At the exchanges, Edward was accompanied by Borders and, pursuant to her request, Marianne was accompanied by officers from the Zionsville Police Department. During one exchange, three police officers arrived at the church shortly before Marianne. When Marianne drove into the parking lot, she stopped approximately 150 yards away, honked her horn and flashed her lights. The officers then physically removed M.S. from Edward's vehicle and placed her in Marianne's car.

On April 17, 1996, Edward filed a petition for contempt against Marianne, alleging that she violated the court's restraining order when she left the messages on his answering machine. At this time, as a result of numerous continuances requested by the parties and several changes of judge, the trial court had still not ruled on Marianne's petition to modify custody. However, the trial court

proceeded with the contempt hearing on July 5, 1996, after which it found Marianne in contempt and ordered her to complete eight hours of community service, apologize to Edward and pay his attorney's fees.

Thereafter, on July 27, 1996, Edward filed an emergency petition for modification of custody and supervised visitation. Four days later, Marianne moved for reconsideration of the contempt finding. A hearing was conducted on both Edward's and Marianne's petitions for modification of custody in November, 1996. During the hearing, Edward presented evidence that, prior to the parties' divorce, Marianne's twelve-year-old daughter from a previous marriage, A.L., had inappropriately touched M.S. He then argued that Marianne had not provided adequate counseling for A.L. and had failed to ensure that M.S. was protected from any further incidents with A.L. Additionally, Edward argued that Marianne had engaged in a pattern of parental alienation with M.S. that was affecting her long-term emotional and psychological needs. In support of these arguments, Edward presented the testimony of Dr. Richard Lawlor, a child psychologist, who, after reviewing records and reports from Child Protective Services, Michelle Crane and several other counselors, indicated that Marianne had not taken appropriate action in resolving the incident between M.S. and A.L. He also indicated that Marianne's comments and allegations against Edward were directed at alienating M.S. from Edward and that Marianne's behavior endangered M.S.'s emotional and psychological development.

In response, Marianne argued that the allegations and statements she made about Edward were either true, not made in the presence of M.S., made in the heat of the moment or never occurred. She also indicated that she had obtained counseling for A.L., which A.L. had completed.

Following the hearing, the trial court entered findings of fact and conclusions of law, determining that there had been a substantial change in circumstances which justified a

modification in custody. Specifically, the court determined that Marianne had engaged in a concerted effort to destroy M.S.'s relationship with Edward since the divorce. As a result, the court awarded sole physical and legal custody of M.S. to Edward. Additionally, the court denied Marianne visitation for a period of sixty days, followed by two hours of supervised visitation with M.S. every two weeks for three months. Thereafter, the visitation schedule would be reevaluated. Further, Marianne was ordered to pay Edward's attorney's fees. The trial court did not address Marianne's petition for reconsideration of the contempt finding. Marianne now appeals.

## DISCUSSION AND DECISION

### I. Custody Modification

Marianne initially contends that the trial court erred in modifying the joint custody arrangement and awarding sole custody to Edward. Specifically, she contends that the evidence was insufficient to support the trial court's determination that a substantial change of circumstances had occurred which justified a modification of custody.[3]

Initially, we note our standard of review. In the present case, neither party requested the trial court to enter specific findings of fact or conclusions of law. Instead, the trial court asked the parties to submit proposed findings in lieu of final argument and then entered findings of fact and conclusions of law on its own motion. When a trial court has entered specific findings on its own motion, the specific findings control only as to the issues they cover, and the general judgment controls as to the issues upon which the court has not made findings. *Wagner v. Grant County Dept. of Public Welfare*, 653 N.E.2d 531, 532 (Ind.Ct.App. 1995). The specific findings will not be set aside unless they are clearly erroneous and we will affirm the general judgment on any legal theory supported by the evidence. *Id.* A finding is clearly erroneous when there are no facts or inferences drawn therefrom which

3. At oral argument, Marianne conceded that the trial court was justified in modifying the joint custody arrangement. She continues to contend, however, that the trial court erred in awarding custody to Edward.

support it. *In the Matter of M.B.*, 666 N.E.2d 73, 76 (Ind.Ct.App.1996), *trans. denied.* In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses. *Wardship of J.C., D.D. v. Allen County Office of Family and Children*, 646 N.E.2d 693, 694 (Ind.Ct. App.1995), *trans. denied.* Rather, we consider only the evidence and reasonable inferences drawn therefrom which support the verdict. *Id.*

IND.CODE § 31–1–11.5–22(d) governs child custody modifications and provides, in pertinent part, as follows:

 The court may not modify a child custody order unless:

(1) it is in the best interest of the child; and

(2) there is a substantial change in one (1) or more of the factors listed under section 21(a) of this chapter.

The factors listed in I.C. § 31–1–11.5–21(a) include:

(1) the age and sex of the child;

(2) the wishes of the child's parent or parents;

(3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(5) the child's adjustment to his home, school, and community;

(6) the mental and physical health of all individuals involved; and

(7) evidence of a pattern of domestic violence by either parent.

In considering these factors, the trial court's inquiry is strictly limited to consideration of changes in circumstances which have occurred since the last custody decree. *Spoor v. Spoor*, 641 N.E.2d 1282, 1285 (Ind.Ct.App. 1994).

In the present case, the trial court determined that a modification in the joint custody arrangement was justified because of the continuing conflict between Edward and Marianne. In particular, the court noted that Marianne had failed to adequately protect M.S. from further incidents with A.L. and had engaged in a concerted effort to destroy M.S.'s relationship with Edward. As a result, it concluded that it was in M.S.'s best interests to award sole physical and legal custody to Edward. According to Marianne, the trial court erred in basing its determination on the incident between A.L. and M.S. because it occurred prior to the divorce and, therefore, could not support a finding of a change in circumstances. Additionally, she argues that the evidence does not support a finding that she engaged in a pattern of parental alienation. We disagree.

 Notwithstanding Marianne's contentions to the contrary, we do not find that the trial court improperly based its determination on events which occurred prior to the divorce. Although Marianne argues that the court's decision was based on A.L.'s previous and inappropriate sexual behavior towards M.S., our review of the trial court's findings reveal that its decision was not based on the previous incident, but rather Marianne's failure, since the divorce, to protect M.S. from further incidents by failing to provide appropriate counseling and discipline for A.L. Further, while Marianne presented evidence which established that A.L. had received some counseling and had been released from further sessions, the record also indicates that Marianne had repeatedly informed M.S.'s counselors that the incident with A.L. had been unsubstantiated. However, the Boone County Office of Family and Children specifically stated that the allegations had been substantiated. R. at 1923. Additionally, Dr. Judy Anderson, a clinical psychologist who interviewed A.L. and M.S., specifically stated that "there was inappropriate sex play between the two children." R. at 1972. Given Marianne's failure to acknowledge that the incident between M.S. and A.L. actually occurred and that it was based on Marianne's actions after the divorce, we cannot say that the trial court erred in considering this evidence in determining whether a modification in custody was warranted.

In addition, we agree with the trial court that a substantial change of circumstances had occurred which justified a modification of custody. Generally, lack of cooperation or isolated acts of misconduct by a custodial parent cannot serve as a basis for the modification of child custody. *See Wallin v. Wallin*, 668 N.E.2d 259, 261 (Ind.Ct. App.1996) (noncustodial parent must show something more than isolated acts of misconduct by the custodial parent to warrant custody modification); *see also In re Marriage of Ferguson*, 519 N.E.2d 735, 736 (Ind.Ct. App.1988) (consideration of lack of cooperation in determining change of custody would impermissibly punish parent for noncompliance with custody agreement). However, this court has held that a parent's egregious violation of a custody order or behavior towards another parent, which places a child's welfare at stake, can support a trial court's modification of its custody order. *Pierce v. Pierce*, 620 N.E.2d 726, 730 (Ind.Ct.App. 1993), *trans. denied; see also Needham v. Needham*, 408 N.E.2d 562, 564 (Ind.Ct.App. 1980) (antagonism between parents and mother's attempts to "poison" father in mind of children supported modification of custody). Similarly, we have held that a trial court abuses its discretion when it awards joint custody to parents who have made child rearing a battleground. *Aylward v. Aylward*, 592 N.E.2d 1247, 1252 (Ind.Ct.App. 1992). As we noted in *Aylward*, such a joint custody arrangement " 'may simply provide a framework for the parents to continue the conflict which brought them to divorce in the first place. The conflict would just be focused solely on the children.' " *Id.* (quoting Barteau and Hopkins, *Joint Custody in Indiana*, 27 Res Gestae 320, 324 (1984)).

Although *Pierce* and *Needham* were decided prior to the recent amendment of I.C. § 31–1–11.5–22,[4] we find their rationale applicable under the present statute.[5] In particular, we note that one of the current statutory factors that support a modification of custody is a consideration of "the mental and physical health of all individuals involved." I.C. § 31–1–11.5–21(a)(6). Thus, if one parent can demonstrate that the other has committed misconduct so egregious that it places a child's mental and physical welfare at stake, the trial court may modify the custody order.

Here, the evidence presented at the modification hearing revealed that immediately after Edward and Marianne were awarded joint custody of M.S., numerous disputes arose. Specifically, we note that Marianne made repeated allegations of sexual abuse against Edward, none of which have been substantiated.[6] Additionally, the evidence, as set forth in the FACTS, indicates that Marianne made numerous disparaging comments about, and allegations against, Edward in front of M.S. and others, including comments that M.S. would have to be decontaminated after wearing Edward's hat and that her father hired a hit man. Further, despite the fact that the trial court attempted to minimize the hostility by restricting the parties' interaction and communication to visitation issues, the parties animosity toward one another escalated to the point that a private investigator and the police were involved in simple exchanges of M.S. Finally, the record is replete with evidence demonstrating the parties' inability to communicate with each other in regard to M.S.'s activities, including decisions relating to her education and attendance at church. Based on this

4. Prior to the amendment of the statute in 1994, I.C. § 31–1–11.5.22 provided that the trial court could modify custody only "upon a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable." Now, as previously stated, the statute requires a showing of a substantial change in one of the factors listed under section 21(a).

5. In fact, the amendment to I.C. § 31–1–11.5–22 has resulted in a less stringent standard for custody modifications. *See Joe v. Lebow*, 670 N.E.2d 9, 20 (Ind.Ct.App.1996) (amendment to statute

demonstrated legislature's "disapproval of the very strict showing formerly required for modification of custody").

6. In affirming the trial court's modification of custody, we do not intend to suggest that a parent's allegations of sexual abuse will support a change of custody. Rather, the unsubstantiated allegations against Edward are merely mentioned in conjunction with the parties' failure to communicate and Marianne's other actions as further support of the trial court's determination.

evidence, the trial court could have reasonably concluded that M.S.'s mental and physical welfare was in jeopardy and, as a result, a modification in the joint custody arrangement was necessary.

Nevertheless, Marianne argues that the events listed above were too isolated to support a modification of custody. Further, she argues that she never denied Edward access to M.S. However, her arguments are merely an invitation to reweigh the evidence and reassess the credibility of the witnesses, which we will not do. Similarly, we reject Marianne's assertion that M.S. has not been harmed by these events. As the court-appointed Guardian Ad Litem noted in his report, M.S. has been placed "in the middle of a very intense battle zone." R. at 1182. Under these circumstances and mindful of our standard of review, we conclude that the trial court did not err in modifying the custody order and awarding sole custody to Edward.

## II. Visitation

Next, Marianne argues that the trial court unfairly denied her reasonable visitation with M.S. Specifically, she contends that the trial court's visitation order, which denied her visitation for the first sixty days and then only permitted supervised visitation for two hours every other week for the next three months, effectively terminated her parental rights. Further, she argues that there was no evidence presented to support such restricted visitation and that other restrictions imposed by the court, including supervised visitation and its order prohibiting either party from discussing any matters pertaining to the custody proceedings with M.S., adequately protected M.S.'s best interests.

■ In reviewing a trial court's determination concerning visitation by a noncustodial parent, we may reverse only upon a showing of manifest abuse of the trial court's discretion. *Hunt v. Whalen,* 565 N.E.2d 1109, 1113 (Ind.Ct.App.1991). Without reweighing the evidence or judging the credibility of witnesses, we examine the record to determine whether it discloses evidence or reasonable inferences to be drawn therefrom which rationally support the finding of the trial court. *Id.*

■ Indiana has long recognized that the rights of parents to visit their children is a precious privilege which should be enjoyed by noncustodial parents. *Stewart v. Stewart,* 521 N.E.2d 956, 960 (Ind.Ct.App.1988), *trans. denied.* As a result, a noncustodial parent is generally entitled to reasonable visitation rights. Ind.Code § 31–1–11.5–24(a). However, the right of visitation is subordinated to the best interests of the child. *Stewart,* 521 N.E.2d at 960. Thus, if the trial court finds that visitation might endanger the child's physical health or significantly impair his or her emotional development, visitation may be denied or restricted. I.C. § 31–1–11.5–24(a) and (b).

■ Here, the trial court restricted Marianne's visitation because her behavior and animosity towards Edward and her failure to provide adequate counseling for A.L. placed M.S.'s welfare at stake. As previously noted, the evidence presented at trial sufficiently supported this determination. Further, Dr. Lawlor testified that highly structured, supervised visitation was necessary due to Marianne's behavior and the possibility that she would attempt to undermine M.S.'s relationship with Edward. R. at 1889. We also note that the Guardian Ad Litem specifically recommended that the court severely sanction any visitation by the noncustodial parent due to the parties' volatile relationship and its effects on M.S. R. at 1184. Finally, although concerned by the restrictive nature of the initial custody order, we note that the trial court has recently extended Marianne's visitation to six hours every other week and has allowed for periodic reevaluation of the visitation schedule. Given the animosity between the parties and the trial court's movement towards more liberal visitation, we cannot conclude that the trial court's visitation order constitutes a manifest abuse of discretion. Therefore, we find no error.

## III. Attorney's Fees

Marianne also contends that the trial court erred by awarding Edward attorney's fees. In the present case, the trial court awarded Edward approximately $65,200 in attorney's

fees based on his attorney's efforts in obtaining child support and defending against "Marianne's baseless claims." R. at 1348. According to Marianne, the trial court's award was improper because it was assessed against her as punishment, rather than as a result of a financial disparity between the parties. Alternatively, she argues that the size of the award was unreasonable.

Pursuant to IND.CODE § 31–1–11.5–16(a), a trial court may order a party to pay a reasonable amount for the cost to the other party of defending or maintaining any action in dissolution proceedings. When making such an award, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income and other factors that bear on the reasonableness of the award. *In re the Marriage of Lewis,* 638 N.E.2d 859, 861 (Ind.Ct. App.1994). Additionally, misconduct that directly results in additional litigation expenses may be properly taken into account in the trial court's decision to award attorney's fees. *Id.* However, an award of fees under this statute cannot rest solely on a determination that the case is unmeritorious or malicious. *Jenkins v. Jenkins,* 567 N.E.2d 136, 140 (Ind. Ct.App.1991).

In any event, we will not disturb the trial court's decision absent an abuse of discretion. *Id.* An abuse of discretion occurs when the court's ruling is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom. *Id.*

In the instant case, the record reveals that Edward and Marianne had similar financial assets and incomes. Specifically, Marianne earned between $60,000 and $75,000 annually as an employee of Guardian Insurance and had recently sold her own insurance business for $109,000, while Edward had a gross weekly income of $1300 from disability payments, payments from the sale of his dental practice and the rental of his dental office. Edward also retained the family residence. R. at 1037, 1779, 1798, 1819, 2949. However, the parties' financial condition is only one factor to be considered by the trial court when considering an award

of attorney's fees. As noted above, the court may also consider a party's misconduct which results in additional litigation expenses for the other. Here, the record is replete with evidence that Marianne engaged in misconduct throughout the modification proceedings. For example, in addition to repeatedly making harassing phone calls to Edward, she persisted in alleging that Edward had sexually abused M.S., even though Child Protective Services did not substantiate the allegations and closed its investigation. At one point in the litigation, Marianne even called Edward to inform him that she was being represented by the judge's former law partner, insinuating that she would have an advantage at trial. As a result of this misconduct, Edward was forced to obtain a restraining order, seek a change of judge and prepare to defend against the sexual abuse allegations. Given the fact that the trial court was in the best position to judge Marianne's demeanor, the veracity of her claims and her financial resources, we cannot conclude that the trial court abused its discretion in awarding Edward attorney's fees.

Similarly, we cannot conclude that the size of the award was unreasonable. As Marianne notes, when awarding fees, the trial court may look at the responsibility of the parties in incurring the fees and whether they were generated in bad faith. *McCallister v. McCallister,* 488 N.E.2d 1147, 1154 (Ind.Ct.App.1986). Here, although Marianne argues that Edward's attorneys often performed duplicitous and unnecessary work, including employing several attorneys, spending time working with witnesses who never testified at trial and hiring private investigators who failed to discover any useful evidence, we cannot conclude that, based on this alone, Edward's attorney's fees were generated in bad faith. Further, Marianne does not argue, and the record does not indicate, that the hourly rates charged by Edward's attorneys were excessive or unreasonable. Although we are concerned about the need for so many attorneys and the expenditure of such a large amount of funds in custody modification proceedings, we cannot conclude, given the highly contentious nature of this appeal, that the trial court

abused its discretion in determining the reasonableness of Edward's attorneys' fees.[7]

## IV. Contempt

Finally, Marianne contends that the trial court erred by finding her in contempt of its mutual restraining order. During the contempt hearing, Edward alleged that Marianne had violated the court's restraining order by leaving threatening phone messages on his answering machine. Additionally, Edward argued that Marianne had staged the incident with Borders at the truck stop, in which she alleged that he attempted to ram her car. Following the hearing, the court found Marianne in contempt.

According to Marianne, the trial court's finding is erroneous because the phone messages related to visitation issues and, therefore, were within the limits of the restraining order. Additionally, she argues that there was no evidence demonstrating that she staged the incident with Borders. In response, Edward suggests that we do not have jurisdiction to consider Marianne's arguments because she did not appeal the contempt order or the denial of her motion to reconsider this issue in a timely manner.

Initially, we must determine whether Marianne properly appealed the contempt order. Ind.Appellate Rule 2(A) requires every party seeking an appeal to file a praecipe within thirty days of the entry of a final judgment or a final appealable order. Failure to file an appeal in a timely manner is a jurisdictional failure requiring dismissal of the appeal. *Jennings v. Davis,* 634 N.E.2d 810, 810 (Ind.Ct.App.1994).

Under Indiana law, a contempt citation becomes a final appealable order when the court attaches and punishes the defendant by fine or punishment. *Bayless v. Bayless,* 580 N.E.2d 962, 964 (Ind.Ct.App.1991), *trans. denied.* Here, Edward filed a petition for contempt on April 17, 1996. Following a

hearing, the trial court found Marianne in contempt on July 9, 1996, and ordered her to serve community service and pay attorney's fees. Marianne subsequently filed a notice of compliance with the trial court's order on July 23, 1996. However, Marianne did not file her praecipe in the present case until December 10, 1996. Although Marianne filed a motion to reconsider the finding of contempt on July 31, 1996, the trial court did not rule on her motion within five days. As a result, pursuant to Ind.Trial Rule 53.4(B), it was deemed denied at that time. Since Marianne did not file her praecipe within the next thirty days, it appears at first glance that we are precluded from considering the trial court's contempt order.

However, our supreme court recently clarified when an order becomes final and appealable in *Berry v. Huffman,* 643 N.E.2d 327 (Ind.1994). In *Berry,* the supreme court explained that prior to the adoption of our current trial rules, Indiana followed the distinct and definite branch of litigation doctrine. *Id.* at 328. Pursuant to that doctrine, a judgment was final and appealable even if it did not dispose of all of the issues in the litigation, so long as it disposed of "a distinct and definite branch of the litigation." *Id.* The court went on to conclude, however, that Ind.Trial Rule 54(B) and 56(C) superseded the distinct and definite branch doctrine. As a result, "[j]udgments or orders as to less than all of the issues, claims, or parties remain interlocutory until expressly certified as final by the trial judge." *Id.* at 329. The court further explained that such a rule provided "useful certainty to the parties" with regard to when to appeal. *Id.* at 328.

Here, the mutual restraining order and contempt finding were a result of and a central part of the custody modification proceedings. Although the trial court entered an order of contempt and Marianne subsequently complied with the order, the trial

---

7. Our review of the record indicates that Edward and Marianne spent in excess of $110,000 in attorneys' fees during these proceedings. Although it is hard to envision circumstances that warrant such an expenditure of funds, we also note that the trial court was in the best position to judge the parties' claims, demeanor and conduct and the necessity of the attorney's fees. Pursuant to our standard of review, we cannot conclude that such an expenditure was unreasonable. However, we seriously question the reasonableness of such expenditures in a custody modification proceeding.

court did not expressly certify that the order was final and appealable. As a result, the contempt order remained interlocutory and Marianne was not required to file an immediate appeal. Thus, Marianne filed her appeal in a timely manner and we are not precluded from considering her arguments.

▆▆▆▆▆ Although concluding that Marianne appealed the contempt order in a timely manner, we nevertheless find that the trial court did not err by finding her in contempt. Indirect contempt is the willful disobedience of any lawfully entered court order of which the offender had notice. *Andrews v. State,* 505 N.E.2d 815, 830 (Ind.Ct.App.1987). The determination of whether a party is in contempt of court is a matter within the sound discretion of the trial court. *Jackson v. State,* 644 N.E.2d 607, 608 (Ind.Ct.App.1994), *trans. denied.* We will only reverse the trial court's determination for an abuse of discretion. *Id.* An abuse of discretion occurs only when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

▆▆▆ Here, the record reveals that the trial court entered a mutual restraining order in February of 1996, strictly limiting Edward's and Marianne's communication to issues involving "any change in visitation." R. at 144. The record also reveals that Marianne left a phone message on Edward's answering machine on April 12, 1996, informing him that he was traumatizing his daughter, he was going to court and he was in "big time trouble." R. at 2185. Despite Marianne's contentions to the contrary, this message does not pertain to a change in visitation. Further, nothing in the record indicates, and Marianne does not argue, that she did not have notice of the order. In fact, she stated in her message that she would gladly be held in contempt, indicating her knowledge of the mutual restraining order. Therefore, the trial court did not abuse its discretion in determining that Marianne violated its restraining order and holding her in contempt.[8]

8. Having determined that Marianne's phone message constituted a violation of the restraining order and was sufficient to support the finding of

## CONCLUSION

In sum, we hold that the trial court did not err in determining that a modification of the joint custody arrangement was necessary and in awarding Edward sole physical and legal custody of M.S. Similarly, we affirm the trial court's determination with regard to Marianne's visitation rights, its award of attorney's fees to Edward and its finding that Marianne was in contempt of the mutual restraining order.

Judgment affirmed.

DARDEN, J., concurs.

CHEZEM, J., dissents and concurs in result, with opinion.

CHEZEM, Judge, dissenting and concurring in result.

I respectfully dissent as to Issues II and III. I fully concur as to Issue IV, but concur only in result as to Issue I.

**Visitation (Majority's Issue II.)**

I disagree with the majority and find that the trial court's visitation order did indeed constitute a manifest abuse of discretion. The majority accurately states the applicable standard of review on this issue, as well as the long-recognized tradition of Indiana courts in protecting the rights of non-custodial parents to visit their children. A non-custodial parent is entitled to reasonable visitation rights in Indiana. Ind.Code § 31–1–11.5–24(a). "This language gives rise to the presumption that visitation will be in the child's best interest unless it is shown that the parent 'might endanger the child's physical health or impair his emotional development.'" *Stewart v. Stewart,* 521 N.E.2d 956, 963 (Ind.Ct.App.1988), *trans. denied.* Unless the custodial parent rebuts that presumption, the non-custodial parent is entitled to visitation. *Id.* While it is true that a parent's right to visitation may be denied or restricted if the trial court finds that such visitation might endanger the child's physical health or significantly impair his or her emotional de-

contempt, we need not consider her arguments regarding the truck stop incident.

velopment, parents cannot be deprived of visitation with their children merely because some preconceived danger exists when precautionary measures are available. *Id.* at 965.

The trial court's restrictive visitation order deprived Marianne of contact with her six year old daughter for an initial sixty day period. This no-contact period was followed by a three month period during which visitation was restricted to only two hours every other Saturday from 11:00 a.m. to 1:00 p.m. According to the record, Marianne is currently only allowed six hours of visitation every other week. This draconian denial of any meaningful relationship between Marianne and her daughter has effectively served as a termination of Marianne's right to visitation with M.S. and constitutes an abuse of discretion.

Parents cannot be deprived of all visitation with their children merely because some possibility of danger exists. *Stewart*, 521 N.E.2d at 965. "The level of danger must be examined and appropriate precautions taken. *Id.* Only in this way can both the parent's visitation rights and the child's health and welfare be fairly and fully protected." *Id.* In the present case, the trial court's visitation order required that all visits between Marianne and M.S. be supervised. The order also required Marianne to attend and complete a parenting program as a condition precedent to visitation and specifically prohibited her from discussing the divorce or any court matters with M.S., subject to the contempt powers of the court. By imposing the requirement of supervision and the parenting program, the trial court cautiously and effectively protected M.S. from any perceived possible harm to her emotional health. However, the trial court went too far by requiring a sixty day no-contact period followed by the unduly restrictive visitation schedule outlined above. In so doing, the trial court effectively terminated Marianne's right to visitation with M.S.

Further, by forbidding Marianne and Edward from having any discussion of the divorce or any court matters with M.S., the trial court intolerably invaded M.S.'s right to receive parenting from both her parents. The parental divorce is a significant life event for a child. When Marianne, in following the court's order, refuses to allow M.S. to talk to her about what is happening to her family, she is forced to send a message through silence that may be more harmful than a forthright response.[9] The child surely knows her parents do not like each other. To require both parents to send the message that they do not want to discuss these events with M.S. is devastating. The requirement of supervised visitation is adequate to avoid possible future negative events. The child should be allowed to develop and process her own understanding of the divorce and the court should not stand in the way of her seeing the imperfections of both parents.

Because the evidence in this case did not rationally support the result, a manifest abuse of discretion occurred. Accordingly, I would reverse and remand with instructions for the trial court to issue a new order giving Marianne reasonable visitation with M.S.

## Attorneys' Fees (Majority's Issue III)

Likewise, I dissent from the majority's conclusion that the trial court properly awarded Edward all of his attorneys' fees. Pursuant to Ind.Code § 31–1–11.5–16(a), a trial court "may order a party to pay a *reasonable* amount for the cost to the other party of maintaining or defending any proceeding ... and for attorney fees." (emphasis added). However, as the majority correctly states, caselaw has added an additional requirement that the trial court, in making such an award, *must* consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income and other factors that bear on the reasonableness of the award. *Jenkins v. Jenkins*, 567 N.E.2d 136, 140 (Ind.Ct.App. 1991) (emphasis added). Moreover, an

9. For example, the record reveals that the trial court's order specifically forbade Edward and Marianne from discussing "any divorce or court matters" with M.S. Consequently, the child was precluded from any contact with her mother, without explanation, for two months, including Christmas when even Marianne's request for a telephone call was denied. (R. 1346, 1366–73).

award of attorney's fees cannot rest solely on a determination by the trial court that the case is unmeritorious or malicious. *Id.*

The record reveals that the trial court awarded Edward virtually 100% of his attorneys' fees for "obtaining child support for this minor child and for their efforts in protecting the minor child from the conduct of Marianne Lawrence Spolnik." (R. 1347). The trial court also specifically found that Mr. Saint's attorney fees were "earned by Mr. Saint in obtaining child support for the minor child and defending Marianne's baseless claims in this case." (R. 1348). The trial court offered no other explanation for its findings and there is no evidence that the trial court considered the parties' economic resources in arriving at its decision. Additionally, the record reveals that Edward and Marianne had similar assets and incomes. Thus, I must conclude that the trial court awarded all attorneys' fees to Edward either for punitive reasons, or because it perceived Marianne's claims to be unmeritorious. In so doing, the trial court did not fulfill its obligation imposed by Ind.Code § 31–1–11.5–16 and Indiana caselaw, thereby committing an abuse of its discretion. I would reverse the award of attorneys' fees.

## Custody Modification (Majority's Issue I)

I concur in the modification of the custody agreement between Edward and Marianne because there is sufficient evidence in the record which indicates that the relationship between the parties, following their divorce, deteriorated to such a degree that the existing joint custody agreement was an upsetting and unworkable solution. This conclusion is supported by the Guardian Ad Litem's report which stated that, "[the] joint custody agreement was doomed to fail from the beginning. Both parents have great animosity toward the other, which unfortunately places [M.S.] in the middle of a very intense battle zone." (R. 1182). Moreover, both parties petitioned the court for modification of the then existing custody agreement. I respectfully decline to join in the opinion of the majority, however, to the extent that it validates the trial court's reliance on "Parental Alienation Syndrome" (PAS) evidence. Admittedly, the trial judge never specifically

used the term PAS. It is clear from the language in his findings, however, that the trial court relied heavily on the testimony offered by Dr. Lawlor regarding this "syndrome" and all but used the exact term "PAS" when stating its findings of fact and conclusions of law. I recognize the concept of "parental alienation" and understand that it is not uncommon for parents, during a dissolution proceeding, to make disparaging comments about their respective spouses in the presence of their children. However, I am troubled by, and seriously question the existence of a parental alienation "syndrome".

PAS is a relatively new theory created by Dr. Richard A. Gardner, M.D., and is explained in his self-published book, *The Parental Alienation Syndrome* (1992). This theory, developed solely through Gardner's personal observations of his own patients in private practice, is defined by Gardner as a situation where children are not merely systematically and consciously "brainwashed", but are also subconsciously and unsubconsciously "programmed" by one parent against the other parent. Gardner, *The Parental Alienation Syndrome* p. 59–60. Gardner further asserts, "PAS is a disorder of children, arising almost exclusively in child-custody disputes, in which one parent (usually the mother) programs the child to hate the other parent (usually the father)." Richard A. Gardner, *Dr. Gardner Defends Work on Sex Abuse*, Nat'l L.J., Sept. 6, 1993, at 16. Moreover, Dr. Gardner professes that in 90% of the cases it is only the mother who attempts to alienate the children from the father. Gardner, *The Parental Alienation Syndrome* at 62, 106. When questioned as to why women are programming their children against their fathers in nine out of ten cases where PAS is present, Dr. Gardner explains by quoting William Congreve: "Heaven has no rage, like love turned to hatred. Nor hell a fury, like a woman scorn'd." *Id.* at 62, 122. This gender-biased generalization is ludicrous and an affront to all reasonable women and men. This is unacceptable.

The record indicates that Dr. Lawlor, a clinical psychologist and attorney, testified as an expert witness in this case. His testimo-

ny, elicited primarily through a series of one-sided hypotheticals, was replete with PAS language suggesting that Marianne was causing PAS to occur in M.S., but was not yet a "full blown syndrome." (R. 1917). For example, Dr. Lawlor's responses on direct examination included language such as, "[Marianne is] systematically trying to convey through a denigration of father that he's evil, that uh he's dangerous, and that the child uh shouldn't be involved with [Edward]." (R. 1887). Dr. Lawlor also stated during his direct examination that he thought it was, ". . . extremely detrimental to be in custody of a parent who's engaging in a pattern of alienation against the other parent" and that the research on parental alienation shows that the ". . . prognosis [for the child] is poor once uh an alienation situation uh has developed. Uh the success rate is almost zero and the failure rate is almost a hundred percent in cases like that once they get going." (R. 1880). Furthermore, Dr. Lawlor admitted under oath that he is familiar with Dr. Gardner's syndrome called "Parental Alienation Syndrome" and described it as ". . . a situation where you have a systematic uh attempt at denigration of the parent with with attempts at isolation of the child from the parent." (R. 1910)

Dr. Lawlor's "PAS language" is rephrased and woven throughout the trial court's findings, as can be seen in his specific finding number eight which includes statements such as:

8. The Court Specifically finds that since the joint custody agreement in this case, Marianne, beyond a reasonable doubt, has engaged in a concerted bad faith effort to destroy any relationship the minor child, [M.S.], has with Edward. It is not necessary to include the litany of vicious and false allegations made by Marianne against Edward ... Marianne ... made numerous trips to social workers and counselors alleging unsubstantiated allegations of Edward's conduct, his psychiatric condition, and a general vicious broadside on Edward's character. Marianne met willing

accomplices with her visits to social workers and counselors and continued to allege to the counselors false and vicious rumors. Marianne established no basis in fact or believable testimony that would support her baseless claims ... Marianne's false and disgusting behavior based on false allegations were beyond a doubt designed to destroy any relationship Edward has with Margaret. (R. 1344–45).

There are also several other significant problems with PAS including "causation", "scientific reliability" and "admissibility" as scientific evidence [10]. Dr. Garner's PAS syndrome has no apparent objective criteria to determine its validity or its reliability. Moreover, PAS has not been subjected to peer review and has not gained general acceptance by scientists in the relevant scientific communities. Thus, it is my opinion that Dr. Garner's PAS "disorder" is a disturbing, inflammatory, unscientific and unsubstantiated theory which has no place in our courtrooms. As the court in *United States v. Brown,* 557 F.2d 541 (6th Cir.1977) so eloquently stated, "A courtroom is not a research laboratory. The fate of [a party] should not hang on his ability to successfully rebut scientific evidence which bears an 'aura of special reliability and trustworthiness,' although, in reality the witness is testifying on the basis of an unproved hypothesis in an isolated experiment which has yet to gain general acceptance in its field." *Id.* at 556. The PAS syndrome described by Dr. Garner is analogous to "cult" theories like the "Peter Pan Syndrome" or the "Cinderella Complex", and is more suitable in a pop psychology venue rather than in a court of law.

Finally, the record reveals that Edward has emotional problems so severe that he is totally disabled and unable to work. Moreover, Dr. Lawlor, who never interviewed Marianne, Edward, or M.S., apparently formed his opinions based on notes from Dr. Crane, a therapist who also had never met Edward. Thus, Dr. Lawlor and the therapist would be unable to determine the extent to

10. *See generally* Cheri L. Wood, The Parental Alienation Syndrome: A Dangerous Aura of Reliability, 27 Loy.L.A.L.Rev. 1367 (1994); Judith S. Wallerstein, Through A Child's Eyes, Fam. Advo., (Summer 1990); Lucy Berliner & Jon R. Conte, Sexual Abuse Evaluations: Conceptual and Empirical Obstacles, 17 Child Abuse & Neglect 111 (1993).

which Marianne's allegations regarding Edward's conduct might be true. Further, the lack of clinical research to substantiate the theory of PAS, along with the lack of evidence as to Edward's emotional health and the slender threads of evidence which supported the hypotheticals posed to Dr. Lawlor, make the apparent recognition of PAS very troubling. This case poses a threat not only to the well-being of this small child, but also to any child with less than perfect parents who are divorcing.