Garry L. KIRK, Appellant–Petitioner,

v.

Kathy Mae KIRK, Appellee–
Respondent.

No. 45A03–0103–CV–80.

Court of Appeals of Indiana.

Dec. 5, 2001.

Rehearing Denied Jan. 9, 2002.

Gregory S. Reising, Gary, Indiana, Attorney for Appellant.

Jason L. Horn, Munster, Indiana, Attorney for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellant-petitioner Garry L. Kirk ("Father") appeals the trial court's denial of his petition for modification of custody of and visitation with his daughter G.L.K. We reverse and remand.

### Issues

Father raises one issue on appeal, which we restate as the following two:

I. whether the trial court abused its discretion in denying Father's petition for modification of custody; and

II. whether the trial court abused its discretion in denying Father's petition for modification of visitation.

## Facts and Procedural History[1]

The marriage of Father and appellee-respondent Kathy Mae Kirk ("Mother") was dissolved on March 31, 1992. Mother was awarded legal and physical custody of G.L.K., who was born in 1989. At first, Father exercised unsupervised visitation with G.L.K. every other weekend; at Mother's suggestion, this developed into visitation where all three were present. Until mid 1995, Father maintained visitation in this manner every other weekend for approximately seven hours on either Saturday or Sunday. In September 1995, Mother accused him of sexually molesting G.L.K. and refused to allow further visitation. In October 1995, Father petitioned the court to hold Mother in contempt for withholding visitation, and the following month, Mother petitioned for modification of visitation, citing the alleged molestation. In February 1996, Father filed his first petition for change of custody and modification of visitation.

Over the next five years, the trial court repeatedly attempted to establish regular visitation between Father and G.L.K., but all attempts were unsuccessful. The court appointed a total of seven experts and two guardians ad litem ("GALs"), received two more petitions from Father, and held Mother in contempt three times. All experts and GALs who filed reports with the court expressed concern over Mother's and G.L.K.'s mental health and recommended that the court consider a change in custody if Mother did not cooperate with attempts at reunification. Significantly, none of the experts felt that there was any credible evidence that the alleged molestation had actually taken place, and no criminal charges have ever been brought against Father. Finally, on January 16, 2001, the court ruled on all issues, denying Father's petition for change of custody, ordering family therapy for all parties, and prescribing new visitation guidelines. Father was to have visitation supervised by Mother's parents once a week for three hours, and after eight weeks was to have weekly four-hour unsupervised visitations in a public place. Father now appeals.

## Discussion and Decision

### I. Custody Modification

█ Father alleges that the trial court abused its discretion in denying his peti-

---

1. We find the statements of fact in Father's original and reply briefs to be unacceptably argumentative.

  The summary of facts required by A.R. 8.3(A)(5) [currently Indiana Appellate Rule 46(A)(6) ] is not intended to be a portion of the appellant's argument. It should be a concise narrative summary of the facts in light most favorable to the judgment. It should not be a summary of each witness['s] testimony. It is to be informative, not persuasive.

*Moore v. State*, 426 N.E.2d 86, 90 (Ind.Ct.App. 1981). We strongly disapprove of Father's remarks disparaging both the trial court and

its decision in this case. Father terms the trial court's order "ludicrous" and "the ultimate in abuse of discretion." Father further opines: "It appears that after looking for years for psychologists who would agree with her, the court simply did what she wanted to regardless of the evidence." We remind Father of Indiana Professional Conduct Rule 3.5, the comment to which states: "An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence and theatrics."

tion for modification of custody. Because stability and permanence are considered best for the child, when a non-custodial party petitions for a modification in custody, the burden is on that party to demonstrate that the existing custody order is unreasonable. *See Fields v. Fields,* 749 N.E.2d 100, 108 (Ind.Ct.App.2001), *trans. denied.* Indiana Code Section 31–17–2–21 provides that a court may not modify a custody order unless the petitioner shows that (1) the modification would be in the best interests of the child, and that (2) a substantial change has occurred in one or more of the following factors a court must consider under Indiana Code Section 31–17–2–8:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

In its consideration of the statutory factors, the trial court's inquiry is limited to changes that have occurred since the last custody decree. *See Hanson v. Spolnik,* 685 N.E.2d 71, 77 (Ind.Ct.App.1997), *trans. denied.*

■ The modification of custody lies within the sound discretion of the court, and we will reverse only upon a showing of manifest abuse of this discretion. *See Fields,* 749 N.E.2d at 107–08. We find such an abuse when the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Id.* at 108. We will neither judge the credibility of witnesses nor reweigh the evidence. *Id.* Neither party requested, and the trial court did not enter, special findings in this case; therefore we review under the general judgment standard. *See Shelby Eng'g Co. v. Action Steel Supply, Inc.,* 707 N.E.2d 1026, 1027 (Ind.Ct.App.1999). Under this standard, we affirm if the judgment can be sustained on any legal theory consistent with the evidence. *See id.*

Father claims that the court's ruling is contrary to all evidence and expert advice, save for the opinions of Mother and G.L.K., and that the court therefore abused its discretion in denying his petition. We must examine the record in detail to evaluate this claim.

In November 1996, clinical psychologist Dr. Marguerite P. Rebesco ("Rebesco") recommended that the court order professionally directed reunification efforts and that if such reunification could not reasonably occur within four months, "an alternate residential setting *that would promote* [G.L.K.'s] *health* may need to be considered." (Emphasis added.) This recommendation was seconded one month later in a report by the GAL, attorney Cheryl Lynn Moultrie ("Moultrie"), who stated that reunification efforts utilizing professional guidance by a qualified therapist should commence immediately and that if reunification "cannot reasonably occur within four months, an alternate residential setting for [G.L.K.] shall be determined by the court *to promote* [G.L.K.'s] *health.*" (Emphasis added.) Four months later, Moultrie reported that there had been no progress since her earlier report

and again recommended a custodial evaluation to determine Mother's fitness to retain custody of G.L.K. She also opined that "[G.L.K.'s] belief of the allegations [of molestation] is directly related and substantially caused by the *pathology between* [Mother] *and* [G.L.K.]." (Emphasis added.)

In July 1997, Moultrie filed an additional report with the court. She noted the emotional distancing between G.L.K. and Father, stating, "Every indication suggests that the mother has continuously and persuasively supported and orchestrated this distancing.... The mother has systematically refused to cooperate with a *therapeutic reuniting of child with father.*" (Emphasis added.) Moultrie again recommended that the court oversee the therapeutic reunification of Father and G.L.K.

Six months later, clinical psychologist Dr. Ronald Ruff ("Ruff") reported to the court:

> [R]eunification between [Father] and [G.L.K.] will be extremely difficult due to the *dysfunctional, highly symbiotic, codependency which exists between* [Mother and G.L.K.].... [Mother's] non-inclusion of [Father] and total desire for her daughter to deny and disown her father's existence and presence in her life is extremely emotionally unhealthy. It is my opinion that this psychopathology relates to [Mother's] dysfunctional nature with respect to wanting to maintain almost total control of her daughter's life ....

(Emphasis added.) Ruff recommended therapeutic reunification efforts and "that serious consideration be given to removing [G.L.K.] to a neutral residential placement which would allow her the opportunity to develop her sense of identity, autonomy, and to effect a more positive relationship with her father." After issuing the above report, Ruff commenced therapeutic reuni-

fication sessions with G.L.K. and Father. In April 1998, Ruff diagnosed G.L.K. with parental alienation syndrome and again recommended "that the court consider removing [G.L.K.] to a more neutral setting so that she can have the opportunity to form her own, independent views of her father without any potential interference or alienation."

In July 1998, clinical psychologist Douglas W. Caruana ("Caruana"), submitted his report to the court. Caruana noted that "[d]ata generated in this evaluation is strikingly similar to the previous professional reports" and that

> [t]he recommendations offered by Dr. Rebesco in her November 27, 1996 report are extremely accurate, concise and should be given the strongest consideration.... These recommendations assume compliance by both [Father] and [Mother]. In particular, [Mother] will need to demonstrate the necessary willingness to resolve her pathological contribution in this case, while supporting her daughter with a healthy and accurate effort. Without this, she should not be allowed to continue in the role of custodial parent.

In February 1999, Caruana advised the court of Mother's refusal to cooperate in reunification sessions and advised that "[i]f this lack of cooperation is substantiated, it ... indicates a strong need for judicial intervention as soon as possible to resolve this impasse. I believe that continued obstruction of the healing process by any of the parties involved is *detrimental to the well being of the minor child in this case,* and must be dealt with directly." (Emphasis added.)

In March 1998, Carole Dougherty, ACSW/LCSW, ("Dougherty") appointed by the court to begin therapeutic reunification sessions, reported Mother's total lack of cooperation. She summarized the pre-

vious professional evaluations and recommendations and noted her agreement with the expressed concerns, beginning with Rebesco's fears first expressed in 1996 regarding the welfare of G.L.K. Dougherty advised the court:

The help that each of us; Dr. Rebesco, Dr. Themer, Dr. Ruff, Cheryl Moultrie, Dr. Caruana, the court and I attempted to provide this little girl, [G.L.K.], has long been thwarted by [Mother]. I am just the latest in a long line of professionals who have met with [Mother's] manipulation of the system for her own purposes. Cheryl Moultrie was outraged two years ago that [Mother] "has systematically refused to cooperate with a therapeutic reuniting of child and father."

Every professional before me attempted the logical and conservative approach to this problem .... Each before me warned that if these efforts were unable to be met a more drastic approach would need to be taken....

I respectfully submit to this court that too many years have passed without this child getting the limits and boundaries set to protect her....

I believe the time has come to place [G.L.K.] in a residential environment away from her mother's full-time influence. [G.L.K.] *is a victim in a severe case of parental alienation syndrome*.... This is, indeed, a drastic level of intervention, however, this situation has become in need of drastic solutions or history will repeat itself.

(Emphasis added.)

A few days following Dougherty's report, Caruana, appointed by the court as the therapy coordinator, advised the court of Mother's failure to cooperate, supported Dougherty's recommendations, and stated that "[g]iven the history of this case and data available to me, I expect that [Moth-er's] efforts to sabotage reunification will exceed her cooperation, continuing a *destructive influence on* [G.L.K.'s] *psychological well being and development*." (Emphasis added.) In August 1998, Caruana reported that he still was not receiving cooperation from Mother and "that an intervention by the court will be necessary."

On August 10, 1999, Dougherty informed the court that "[w]e appear to be at a crisis point in efforts toward reunification" and that neither G.L.K. "[n]or her mother understand the seriousness of the process." She recommended that Mother be found in contempt unless she took immediate steps to bring herself into compliance. On August 27, 1999, Dougherty made her final report to the court, recommending that G.L.K. be removed from Mother's home and stating that Mother "has proved once again that she will not change" and that if Mother "is given one more chance we will be doing the same thing over and over again. [G.L.K.] and her father deserve a chance to expect a different result." Dougherty also noted that there was evidence that G.L.K. had told many of her classmates and teachers that Father had sexually molested her.

On October 29, 1999, Vicky Oliver, M.A., LSCW ("Oliver"), Dougherty's successor, wrote to the court, "I feel I underestimated the dangerousness and level of pathology of [Mother]. I feel she is extremely destructive. She will go to great lengths to sabotage reunification efforts between [G.L.K.] and [Father]. I feel that as long as this child remains in the home with [Mother], reunification between [G.L.K.] and her father is an impossible task." Referring to her experiences with the case to that point, Oliver also wrote that

"I am requesting a restraining order against [Mother] and withdrawing from the case. I can not submit myself to

false allegations of abuse and place my license and reputation on the line. I feel [Mother] will continue to fabricate false accusations against anyone who is attempting to aide [*sic*] in the reunification process. I also feel that the longer this is drawn out, without a ruling by the court, will only allow [Mother] to escalate further and use more and more destructive means to try and sabotage the process. *I also feel* [G.L.K.'s] *mental stability is at risk.*"

(Emphasis added.)

On October 20, 2000, Dr. Phillip Helding ("Helding"), appointed by the court to conduct a custody evaluation, reported that both parents suffer serious character pathology. Nevertheless, Helding recommended that legal custody of G.L.K. be given to Father, with Mother retaining physical custody. If that proved untenable, Helding recommended that Father move to G.L.K.'s neighborhood and assume physical custody. Helding further recommended that if, during such time that G.L.K. resides with Mother, Mother interferes with Father's visitation, physical custody should be transferred to Father even if this meant G.L.K.'s relocation to Illinois.

■ The voluminous evidence leads unerringly to but one conclusion: that there has been a substantial negative change in G.L.K.'s mental health since the last custody determination and that a change of custody is not only in her best interests but also is imperative and long overdue. Mother has consistently manipulated G.L.K. and the judicial system to thwart all efforts to accomplish reunification between G.L.K. and Father, to G.L.K.'s detriment. We conclude that the trial court abused its discretion in allowing Mother to retain legal and physical custody of G.L.K. despite overwhelming evidence that their relationship was harmful to G.L.K.'s men-

tal health. We reverse and remand with instructions for the trial court to grant legal custody to Father and to grant physical custody either to Father or to a neutral third party.

### II. Visitation Modification

■ Father contends that the trial court abused its discretion in denying him "normal" visitation; since he does not define "normal," we presume that he means more frequent and/or unsupervised visitation. A court may modify visitation rights whenever a modification would serve the child's best interests, *see* IND.CODE § 31–17–4–2, and the petitioner must show a changed circumstance in one of the factors listed in Indiana Code Section 31–17–2–8. *See Taylor v. Buehler,* 694 N.E.2d 1156, 1161 and n. 7 (Ind.Ct.App.1998), *trans. denied.* In reviewing a trial court's determination concerning visitation by a non-custodial parent, we may reverse only upon a showing of manifest abuse of the trial court's discretion. *See Hanson,* 685 N.E.2d at 79. We will neither reweigh the evidence nor judge the credibility of witnesses, but will examine the record to determine whether it discloses evidence or reasonable inferences to be drawn therefrom which rationally support the trial court's finding. *See id.*

■ Father was granted visitation supervised by Mother's parents for three hours each week for eight weeks, to be followed by unsupervised public visitation for four hours each week thereafter. No overnight visitation was to be allowed until recommended by the treating therapist. In addition, Father, Mother, and G.L.K. were ordered to enter family counseling, and the parents were directed not to speak negatively about one another in the presence of the child. In its order, the trial court noted the "adverse physical and emotional response" G.L.K. has to

visitation with Father. During previous visitations, G.L.K. has cried, hidden in a restroom, and soiled her underwear. Our examination of the record convinces us that these severe negative reactions are a direct result of Mother's manipulation of G.L.K., but they do appear to be genuine. Although it might be appropriate to limit Father's visitation rights, because of the custody modification we have ordered we must reverse and remand for a new determination of the visitation rights of all parties.

Reversed and remanded.

KIRSCH, J., and BAILEY, J., concur.