768 N.E.2d 990 (2002)
In the Matter of the PATERNITY OF V.A.M.C., A Child Born Out of Wedlock.
James Moden, III, Appellant-Petitioner,
v.
Rosa Corr, Appellee-Respondent.
No. 71A03-0112-JV-431.
Court of Appeals of Indiana.
May 30, 2002.
*991 Fred R. Hains, Joel Gabrielse, South Bend, IN, Attorneys for Appellant.
Robert J. Palmer, May Oberfell & Lorber, South Bend, IN, Attorney for Appellee.

OPINION
SHARPNACK, Judge.
James Moden, III, ("Father") appeals the trial court's order regarding custody of and visitation with his three-year old daughter, V.A.M.C. Father raises two issues, which we expand and restate as:
1. Whether two of the trial court's findings of fact are clearly erroneous because they are unsupported by the evidence;
2. Whether the trial court's findings support the trial court's decision to award physical custody to Rosa Corr ("Mother"); and
3. Whether the trial court abused its discretion, exceeded its statutory authority, or violated Father's constitutional right to free association when it ordered that Father's fiancé, Rebecca Rohrs, is not to have contact with V.A.M.C. when V.A.M.C. is in Father's custody.
We affirm in part, reverse in part, and remand.
The facts most favorable to the judgment follow.[1] Mother and her husband, Edward Corr, live in South Bend with their two children, who are twelve and four *992 years old. Father lives in Napoleon, Ohio. During the course of the Corrs' marriage, Mother had an affair with Father, and that affair resulted in the conception of V.A.M.C. While Mother was pregnant with V.A.M.C., the Corrs decided to remain married and Mother discontinued contact with Father. After Father's relationship with Mother ended, Father began dating and is now engaged to Rohrs, who has two teenage children from a prior marriage.
V.A.M.C. was born on May 25, 1999. Mother refused to allow Father to see V.A.M.C. On June 15, 1999, Father filed a Petition to Establish Paternity of V.A.M.C. On November 12, 1999, Father's paternity was established. At that time, the trial court gave temporary custody of V.A.M.C. to Mother, ordered Father to pay child support, and established times when Father could visit with V.A.M.C. Since the entry of that initial order, the parties have been back in court a number of times to modify the temporary visitation and support order.
In August of 2001, the trial court held fact-finding hearings to determine permanent custody, visitation, and support issues. Following the hearings and the parties' submission of proposed findings and conclusions, the trial court issued an order that gave sole custody of V.A.M.C. to Mother. The trial court's order also gave Father visitation with V.A.M.C. according to the Indiana Parenting Time Guidelines; however, it prohibited Father from allowing Rohrs to have contact with V.A.M.C. Specifically, the trial court's order included the following:
Following a hearing before Jane Woodward Miller, MAGISTRATE of the St. Joseph Probate Court on August 20, 2001, August 22, 2001, August 23, 2001 and August 24, 2001, and after considering the evidence and argument of counsel, the MAGISTRATE enters the following FINDINGS OF FACT and CONCLUSIONS OF LAW which are adopted as the FINDINGS and ORDER of the Court:

FINDINGS OF FACT
1). [V.A.M.C.] is the child of [Mother] and [Father]. She was born May 25, 1999.
2). At the time of [V.A.M.C.]'s conception and birth, [Mother] was married to [Corr]. During the course of the relationship between [V.A.M.C.]'s parents, the parties discussed marriage. An action to dissolve the Corr marriage was initiated; however, [Mother] and her husband ultimately decided to remain married. This decision was made after [V.A.M.C.]'s conception but before her birth.
3). [Corr] and [Mother] are still married. The Corrs have two children, [B.C.], 12, and [A.C.], 4. [V.A.M.C.] lives with her half siblings, [Mother] and [Corr] in South Bend, Indiana. [V.A.M.C.] reportedly has a good relationship with all in her household. [V.A.M.C.] is particularly close to her four[-]year old brother, [A.C.].
4). [Father] is single and lives in Napoleon, Ohio with his parents. [V.A.M.C.] is [Father]'s only child. After the termination of his relationship with [Mother], he became engaged to his next[-]door neighbor, [Rohrs]. [Rohrs] has two teen-age children. No wedding is set for the Rohrs-[Father] marriage. [Rohrs] and [Father] are awaiting the outcome of the custody hearing before making further plans.
5). At some point before [V.A.M.C.]'s birth, contact between [Father] and [Mother] ended. [Mother] would not speak with [Father]. She did not notify [Father] of [V.A.M.C.]'s birth. On June 15, 1999, [Father] filed a petition to establish paternity of [V.A.M.C.]. Until paternity and his legal relationship to his *993 daughter were established, [Father] was not permitted to see [V.A.M.C.].
6). At the November 12, 1999 hearing on [Father]'s petition to establish paternity, this Court granted [Mother] temporary custody of [V.A.M.C.], ordered [Father] to pay support for his daughter's care and entered an order of specific visitation. [Father] has both visited and paid his support regularly.
7). Since the temporary order was entered, the parties have returned to Court a number of times:
a). On January 18, 2000, [Father] filed a Petition to Modify Visitation. By agreement of the parties, the location of visitation was modified to a place outside the Corr home. The Court also directed that the parties participate in co-parenting counseling with Dr. Anthony Berardi.
b). In May, 2000, [Father] again sought a return to Court. At hearing on July 19, 2000, the Court was advised co-parenting counseling had not begun. The Court reaffirmed its order regarding Dr. Berardi and denied [Father]'s request for expanded visitation.
c). On August 25, 2000, [Father] filed an "Emergency Verified Petition to Modify Visitation." By agreement, the South Bend Police Department became the place of [V.A.M.C.]'s exchange.
d). On September 22, 2000, [Father] filed a Petition to Modify Support and to implement the St. Joseph County Standard Visitation Guidelines. On October 16, 2000 this Court modified the support order and denied the visitation petition.
e). Later, while participating in counseling, the parties arrived at an agreement regarding visitation. On November 30, 2000, the Court entered an order modifying visitation. This modified order reflected the agreement reached by the parties.
f). In March, 2001, [Father] requested the Court order a forensic evaluation of the parties. This request was granted and the parties were referred to Dr. Suzanne Watson for evaluation.
8). Since paternity was established, [Father] has expressed a number of concerns regarding [V.A.M.C.]'s physical well-being:
a). According to the DRCB report dated March 23, 2000 (Father's Exhibit B), [Father] and [Rohrs] "expressed concern about the nutrition provided to [V.A.M.C.] in mother's home."
b). On August 2, 2000, Dr. Wycoff, [V.A.M.C.]'s physician, reported to Child Protective Services "she (the doctor) felt whatever medical information she provided to him ([Father]) about [V.A.M.C.] was not good enough for him. She stated she had no concerns of the child, that the child was gaining weight and growing otherwise satisfactorily but that the father himself was not satisfied with her findings." (Mother's Exhibit 1). Dr. Wycoff also stated that [Father] and [Rohrs] had recently come into the office and were rude to her staff. According to [Mother], this incident with [Rohrs] and [Father] almost resulted in [V.A.M.C.]'s termination as a patient of Dr. Wycoff.
c). In a meeting with the DCFS family case manager, Sandra Riehl, on August 2, 2000, [Father] accompanied by [Rohrs], expressed concern [V.A.M.C.] was "being neglected due to lack of nutrition" and also complained that [V.A.M.C.] was dehydrated. [Rohrs] lightly grabbed [V.A.M.C.]'s thigh to demonstrate the point. Ms. Riehl reported she did not *994 view [V.A.M.C.] as neglected. (Mother's Exhibit 1)
d). On July 12, 2000, [Father], using a digital camera he testified that he had purchased specifically for this purpose, photographed [V.A.M.C.]' genital area. (Father's Exhibit D1) According to [Father], he took the pictures because [V.A.M.C.]'s "blisters" (which Dr. Wycoff had determined to be yeast determatitis on July 11) "were clearing up." (Father's testimony in quotes)
e). Additional pictures of [V.A.M.C.]'s genital area were taken on July 26 (Father's Exhibits D1 and D2) and August 2 (Father's Exhibit D2). Since Father's list of visits (Father's Exhibit K) indicates [Rohrs] and not he visited with [V.A.M.C.] on these latter two dates, the Court finds these photographs were taken by [Rohrs].
f). Sometime between July 26, 2000 and July 29, 2000, [Rohrs] showed some, if not all, of these pictures to an Ohio nurse who deals with adult victims of sexual assault. Based on [Rohrs]' reports of this conversation, [Father] believed [V.A.M.C.] may have been sexually molested.
g). On July 29, 2000, [Father] and [Rohrs] took [V.A.M.C.] to the St. Joseph Regional Medical Center for examination for possible sexual abuse. [Father] testified that he did not have any particular suspect in mind when he took [V.A.M.C.] for examination. Nonetheless, he did not advise [Mother] either before or after the examination of what [Rohrs] and he had done. [Mother] first learned of his concerns when she was told by CPS family case manager Sandra Riehl on August 2, 2000.
h). The July 29 examination at St. Joseph Medical Center revealed nothing to indicate [V.A.M.C.] had been sexually molested. [Father], however, was not satisfied with the examination performed by Dr. Jennifer Lackman. [Father] was dissatisfied, in part because Dr. Lackman was not familiar with what [Father] referred to as a sphincter test, a test [Father] performed on his daughter before taking her to the hospital.[2]
i). Given his concerns about [V.A.M.C.] and his dissatisfaction with the examination conducted at St. Joseph Medical Center, [Father], with the help of [Rohrs], showed the pictures of [V.A.M.C.]'s genitals to several other professionals.
j). [Father] had lingering doubts about the molestation as well as concerns about problems he and [Rohrs] perceived with [V.A.M.C.]'s eye and leg. These concerns led him to have [V.A.M.C.] examined by a physician in Ohio in December, 2000. The physician was selected based on [Rohrs]'s familiarity with him. [Father] did not advise [Mother] before or after of his plan to have [V.A.M.C.] examined by a doctor in Ohio. Nothing remarkable was noted by the examining physician.
k). [Father]'s concerns continue. He testified he believed [Mother]'s keeping his child from him is a form of abuse. He also expressed suspicions that [Mother] deliberately tried to promote distress in [V.A.M.C.] so
*995 [V.A.M.C.] would "cause a fit" (Father's testimony) at the police station where [V.A.M.C.]'s visitation exchange occurs.
9). The parties and this Court have sought professional guidance on the issue of custody and visitation. The Court first made a referral to the Domestic Relations Counseling Bureau for a recommendation regarding permanent custody and visitation. This November 12, 1999 referral resulted in a report from the DRCB on March 23, 2000. Within the body of the report, the DRCB made a temporary custody recommendation and suggested the parties be referred to Dr. Anthony Berardi for co-parenting counseling. The Court adopted these recommendations. The Domestic Relations Counseling Bureau has not been involved with the parties since March, 2000.
10). Dr. Anthony Berardi, the psychologist with whom [Father] and [Mother] met for coparenting help, found the degree of distrust between [Father] and [Mother] to be "incredible" when he began working with them in August, 2000. As 2000 drew to a close, Dr. Berardi believed real progress was being made on both sides. Unfortunately, the progress was significantly hampered by [Mother]'s discovery that [Father] and [Rohrs] had taken [V.A.M.C.] in December, 2000 to an Ohio doctor without [Mother]'s knowledge. Dr. Berardi continues to believe, however, that the parties would continue to benefit from counseling once the Court makes a decision in this matter.
11). Dr. Suzanne Watson, the forensic custody evaluator in this case, does not share Dr. Berardi's optimism. The report she prepared, a report which this Court finds does meet the American Psychological Association's custody evaluation guidelines, recommends that custody be granted to [Mother] and that [Father] be denied visitation with [V.A.M.C.]. The Court specifically declines to find Dr. Watson's recommendations were based on a diagnosis of Parent Alienation Syndrome. It was [Father], who, through counsel, first made reference to the syndrome. The basis for Dr. Watson's recommendations are described fully in her report. (Mother's Exhibit 2)
12). Notwithstanding Dr. Watson's recommendations, [Mother] believes it is in [V.A.M.C.]'s best interest that she maintain a relationship with her father. At trial, [Mother] submitted to the Court a document outlining her position, "Mother's Visitation Objectives and Proposal." (Mother's Exhibit 3)
13). Father believes he should be granted custody of [V.A.M.C.] he has suggested that if he is unsuccessful in his pursuit this time, he will continue to litigate this issue until successful.
14). No order can be fashioned which reconciles Dr. Watson's recommendation, Dr. Berardi's opinion, [Mother]'s objectives and [Father]'s absolute determination to gain custody.
15). A dramatic reduction to the conflict between the parties is core to any resolution remotely in the best interest of [V.A.M.C.].
16). [Rohrs], a nonparty to this action, has proved a central player in the difficulties between the parties. (See paragraph 8 and 10 above)
17). Although Dr. Berardi advised [Father] to "try to keep [Rohrs] out of the situation because I thought she was complicating the matter and adding more fuel to the fire," [Rohrs] remained actively involved in the case.
18). [Mother] has requested an order for attorney's fees. Regarding the parties' finances, the Court finds:

*996 a). [Mother] is unemployed. She has two pre-school aged children and cares for them. [Corr] makes $32,000.00 to $36,000.00 per year.
b). [Father] is an engineer and earns $52,768.00 annually. (Child Support Worksheet submitted by the parties 10-16-00) He lives in his parents' home. [Father] pays $119.00 per week for the support of [V.A.M.C.].
c). Mother incurred legal fees in the amount of $8,212.50 during the course of this action. She has paid $3,585.00 toward those fees leaving a balance of $4,627.50. In addition she has incurred costs of $393.70. (Mother's Exhibit 4)

CONCLUSIONS OF LAW
1). The Court now grants care, custody and control of [V.A.M.C.] to [Mother]. In arriving at this decision, the Court is guided by I.C. XX-XX-XX-X which provides:
Custody determinationBest interests of child. The Court shall determine custody in accordance with the best interest of the child. In determining the child's best interests, there is not a presumption favoring either parent. The Court shall consider all relevant factors, including the following:
(1) The age and sex of the child.
(2) The wishes of the child's parents.
(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen
(14) years of age.
(4) The interaction and interrelationship of the child with:
(a) the child's parents;
(b) the child's siblings; and
(c) any other person who may significantly affect the child's best interest.
(5) The child's adjustment to home, school and community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic violence by either parent.
(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the Court shall consider the factors described in section 2.5(b) (IC XX-XX-XX-X.5(b)) of this chapter.
The Court has considered [V.A.M.C.]'s relationship with her siblings (Finding of Fact 3), the inter-relationship of [V.A.M.C.] with [Rohrs] (Finding of Fact 8) and [Father] (Finding of Fact 8 and 11) as particularly significant. Because of the difficulties in the relationship between [Father] and [Mother] (Finding of Fact 5, 7, 8, and 10), the Court does not grant father the right to participate equally in decision making regarding [V.A.M.C.]'s education, religious training and medical treatment.
2). [Father] is granted parenting time in accord with the Indiana Parenting Time Guidelines. Because [Father] has exercised regular care responsibilities for [V.A.M.C.] (Finding of Fact 6, Father's Exhibit K), his parenting time shall include one twenty-four hour period per week.
3). There shall be no contact between [Rohrs] and [V.A.M.C.] during [Father]'s exercise of parenting time. [Father] is ordered to refrain from taking any action, directly or indirectly, that might lead to contact between [V.A.M.C.] and [Rohrs] while [V.A.M.C.] is in his care. Because of the extraordinary nature of this provision, the Court shall review this mandate in one year.
4). Parties are ordered to participate in co-parenting counseling. It is the Court's preference that parties continue such counseling with Dr. Anthony Berardi. [Father] shall be responsible for *997 seventy five percent of the cost of said counseling; mother shall bear twenty five percent of the cost.
5). Pursuant to I.C. XX-XX-XX-X, the Court orders [Father] to pay attorneys fees to [Mother]'s counsel in the sum of $4,000.00 and to pay the additional costs she incurred in the sum of $393.70. In making this award, the Court has considered the parties' resources, their economic condition and present ability to earn adequate income through employment. (Findings of Fact 3 and 14)
Appellant's Appendix at 16-21 (footnote added). After the Magistrate entered these findings of fact and conclusions of law, they were approved and adopted by the Judge of St. Joseph Probate Court.

I.
The first issue is whether two of the trial court's findings of fact are clearly erroneous because they are unsupported by the evidence. Father moved under Trial Rule 52 for the trial court to enter findings of fact and conclusions of law. When a trial court enters findings of fact pursuant to a party's request, we may not set aside those findings unless they are clearly erroneous. Thompson v. Leeper Living Trust, 698 N.E.2d 395, 397 (Ind.Ct. App.1998). A finding of fact is clearly erroneous if the record lacks any evidence or reasonable inferences therefrom to support the finding. Id. When reviewing findings, we may not reweigh the evidence or reassess the credibility of the witnesses. Id. Rather we must consider only the evidence and inferences most favorable to the findings. Id.
First, Father challenges Finding 8(e). That finding states:
e). Additional pictures of [V.A.M.C.]'s genital area were taken on July 26 (Father's Exhibits D1 and D2) and August 2 (Father's Exhibit D2). Since Father's list of visits (Father's Exhibit K) indicates [Rohrs] and not he visited with [V.A.M.C.] on these latter two dates, the Court finds these photographs were taken by [Rohrs].
Appellant's Appendix at 18. Father claims that this finding is erroneous. To support this claim, Father cites the fact that both Rohrs and Father testified that Father took all of the pictures of V.A.M.C.'s genitals. In addition, Father points us to inconsistencies that would exist in Exhibit K if one were to interpret the chart according to the trial court's interpretation. We agree with Father that the trial court erred when it interpreted Exhibit K.
Exhibit K was prepared by Father as a log of the dates of visitation with V.A.M.C. and of the persons who visited with V.A.M.C. on each occasion. Down the left side of the chart is a list of one hundred sixty-one dates. Across the top of the chart are the names of possible persons who could have visited with V.A.M.C. on each occasion, including Father, Rohrs, Father's parents, and Rohrs's children. Apparently, on the dates when a person visited with V.A.M.C., Father placed a "1" on the chart at the intersection of the row for the date and the column for his or her name. At the bottom of the chart is a summary, which indicates that Father visited with V.A.M.C. a total of one hundred fifty-seven times and that Father visited with V.A.M.C. alone on fifty-three of those occasions. Father claims that the trial court erred when it interpreted Exhibit K to mean that Father did not visit with V.A.M.C. on July 26, 2000 and August 2, 2000.
The list of visitation dates includes one hundred sixty-one dates. Four of the dates on the list are followed by the word "Denied" or "Sick," and Father explained that those were scheduled visitation dates when he was unable to see V.A.M.C. Appellant's Appendix at 85, 161. Subtraction of the *998 four dates when Father did not see V.A.M.C. from the total number of dates on the list leaves one hundred fifty-seven dates. Neither at trial nor on appeal does Mother contest that Father visited with V.A.M.C. on one hundred fifty-seven dates. Consequently, the only reasonable interpretation of this chart is that Father visited with V.A.M.C. on all of the dates upon which visitation occurred.
Nevertheless, both the trial court and Mother make much of the fact that, on the chart, there is not a "1" in the column under Father's name in the row for the two dates in question, July 26, 2000, and August 2, 2000. Both the trial court and Mother claim this means that Father was not at the visitation because a "1" in the column under a person's name was used on the rest of the chart to indicate that a person had visited with V.A.M.C. on that occasion.
However, our review of the chart suggests that the "1" in Father's column was used for a different purpose from which it was used in all of the other columns of the chart. Father's column on the chart contains a "1" on fifty-three of the dates listed. On those fifty-three dates, the rest of the columns of the chart indicate that no one else visited with V.A.M.C. on those days. The summary at the end of Exhibit K indicates that Father visited alone with V.A.M.C. on fifty-three occasions. Consequently, the only logical interpretation of the fifty-three occurrences of a "1" in Father's column is that they indicate that Father visited with V.A.M.C. alone on those fifty-three dates.
Using this method of interpreting the chart, rather than the trial court's method, Exhibit K indicates that Father, Rohrs, and Father's mother, Marian, visited with V.A.M.C. on July 26,2000, and that Father and Rohrs visited with V.A.M.C. on August 2, 2000. Because Rohrs was not alone with V.A.M.C. on July 26 or August 2, the trial court's inference that Rohrs was the one who must have taken the pictures of V.A.M.C.'s genitals on those dates is unsupported by the evidence. That Finding is therefore clearly erroneous.
The second Finding that Father challenges is Finding 11. Specifically, Father challenges the portion of Finding 11 that provides: "The Court specifically declines to find Dr. Watson's recommendations were based on a diagnosis of Parental Alienation Syndrome." Appellant's Appendix at 19. Father claims that this sentence is clearly erroneous because Dr. Watson's testimony and report clearly indicate that she based her recommendation on Parental Alienation Syndrome ("PAS").[3] We disagree.
First, even if Father is correct that Dr. Watson based her recommendation upon PAS, there is a difference between basing a recommendation upon a theory and making a diagnosis of a syndrome. In fact, the very testimony that Father cites indicates that Dr. Watson had not diagnosed PAS, because Dr. Watson testified that there was a "risk of" parental alienation in the future. Id. at 45-46. Consequently, when we view the evidence in the light most favorable to the Finding, the challenged *999 sentence in the trial court's Finding 11 is not clearly erroneous.
Moreover, assuming arguendo that the aforementioned sentence constituted an erroneous finding, its inclusion in Finding 11 would not require us to reverse the trial court's decision. See In re M.M., 733 N.E.2d 6, 14 (Ind.Ct.App.2000). As Mother points out in her brief, Father does not question the validity of the remainder of the sentences in Finding 11. In addition, neither at trial nor on appeal did Father challenge the admissibility of Dr. Watson's opinion under Ind. Evidence Rule 702. Consequently, regardless of whether or not Dr. Watson's recommendation was based upon a diagnosis of PAS, Father has not suggested that we should ignore her recommendation that Father should not be allowed to have visitation with V.A.M.C. Rather, Father is requesting that we reassess Dr. Watson's credibility, which we are prohibited from doing by our standard of review. See Thompson, 698 N.E.2d at 397. Finding 11 is not clearly erroneous.

II.
The second issue is whether the trial court's findings support the trial court's decision to award physical custody to Mother. To decide this issue, we apply the second tier of the standard of review used when findings and conclusions have been entered pursuant to a request under Trial Rule 52. See In re J.A.C., 734 N.E.2d 1057, 1059 (Ind.Ct.App.2000). A judgment entered with requested findings will be reversed only if it is clearly erroneous. Id. A judgment is clearly erroneous if it is unsupported by the conclusions, and conclusions are clearly erroneous if they are unsupported by the findings. Id. Consequently, we turn to analyzing whether the trial court's decision is supported by its findings and conclusions.
Here, Father claims that the trial court's decision in Conclusion 1 to give sole custody of V.A.M.C. to Mother is clearly erroneous. Father claims that Conclusion 1 is not supported by the findings because portions of the three Findings that the trial court specified as "particularly significant" were, according to Father, clearly erroneous. Appellant's Appendix at 20. The three Findings specified by the trial court in Conclusion 1 were Findings 3, 8, and 11. Id. We disagree with Father's allegation that Conclusion 1 is not supported by the trial court's Findings.
First, while Father mentioned that Finding 3 was clearly erroneous, Father's Brief did not contain any argument or explanation regarding what was wrong with Finding 3. Appellant's Brief at 18-19, 23. Therefore, Father waived any alleged error regarding Finding 3. Choung v. Iemma, 708 N.E.2d 7, 13 (Ind.Ct.App.1999). Thus, we consider Finding 3 when determining whether the Findings support Conclusion 1.
Second, we held above that the trial court's inference in Finding 8(e) that Rohrs took the pictures of V.A.M.C.'s genitals on July 26 and August 2 was clearly erroneous. See supra Part I. However, Father did not question the validity of the rest of the findings listed in Finding 8. See Appellant's Brief at 18-24. Consequently, we consider the remaining portions of Finding 8 when determining whether the Findings support Conclusion 1.
Third, as mentioned above, while Father questioned the portion of Finding 11 in which the trial court found that Dr. Watson's recommendation was not based upon PAS, Father waived any argument regarding whether Dr. Watson's opinion should have been excluded under Ind. Evidence Rule 702 because he failed to so argue at trial. Consequently, we may consider Dr. Watson's recommendation when determining whether the Findings support Conclusion 1.
*1000 In addition, while the trial court provided that when deciding to grant sole custody to Mother it considered those three Findings "particularly significant," the trial court did not say that its conclusion was based only on those three Findings. See Appellant's Appendix at 20. Consequently, we look at the remaining Findings when determining whether the trial court's conclusion is clearly erroneous. Father claims that those "remaining findings of factas stated by the trial courtdo not support the judgment." Appellant's Brief at 18. We disagree.
Given the "difficulties in the relationship between" Father and Mother that were clearly evidenced by the trial court's Findings numbered 7, 8, 10, 13, and 15, we fail to see how joint custody could have been a viable option. Appellant's Appendix at 20; see, e.g., Hanson v. Spolnik, 685 N.E.2d 71, 78 (Ind.Ct.App.1997) (noting that "a trial court abuses its discretion when it awards joint custody to parents who have made child rearing a battleground"), trans. denied. As between Mother and Father having sole custody of V.A.M.C., the trial court's uncontested Findings indicate that Father continues to seek medical care for V.A.M.C. after repeatedly being told that her health is fine and that she has not been the victim of sexual abuse. Additionally, those Findings indicate that Rohrs participates in seeking unnecessary medical care for V.A.M.C. and is a "central player in the difficulties between the parties." Appellant's Appendix at 19. Consequently, the remaining findings of fact provide support for the trial court's decision to grant sole custody to Mother, and that decision is not clearly erroneous. See, e.g., Owensby v. Lepper, 666 N.E.2d 1251, 1257 (Ind.Ct.App.1996) (holding that the court's findings were sufficient to support its custody decision).

III.
The third issue is whether the trial court abused its discretion, exceeded its statutory authority, or violated Father's constitutional right to free association when it ordered that Rohrs is not to have contact with V.A.M.C. when V.A.M.C. is in Father's custody. Generally speaking, decisions regarding child visitation are committed to the sound discretion of the trial court, and we may reverse such decisions only upon a showing of a manifest abuse of discretion. Hanson, 685 N.E.2d at 79.[4] When reviewing the trial court's decision, we neither reweigh the evidence nor reexamine the credibility of the witnesses. Id. Rather, we view the record in the light most favorable to the trial court's decision to determine whether the evidence and reasonable inferences therefrom support the trial court's decision. Id. An abuse of discretion has occurred if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. In re A.R.R., 634 N.E.2d 786, 788 (Ind.Ct.App.1994). In addition, in custody and visitation cases, the trial court's discretion is limited because it must be exercised in furtherance of the best interests of the child at issue. Id. at 789.
Here, while deciding whether the trial court abused its discretion, we must also determine, pursuant to the standard of review when a party requests findings under Trial Rule 52, whether the trial court's judgment is supported by the conclusions *1001 and whether those conclusions are supported by the findings. In re J.A.C., 734 N.E.2d at 1059. We may affirm the trial court's judgment on any theory supported by the findings. Mitchell v. Mitchell, 695 N.E.2d 920, 923 (Ind.1998). Nevertheless, because a judgment entered with findings pursuant to a Trial Rule 52 request is not a "general judgment," we may not affirm the judgment merely because it is supported by evidence in the record. See In re D.G., 702 N.E.2d 777, 780 (Ind.Ct.App.1998). Rather, we must determine whether the findings outlined by the trial court are sufficient to support the judgment. See In re J.A.C., 734 N.E.2d at 1059.
Ind.Code § 31-14-14-1, which outlines the visitation rights of a noncustodial parent in a paternity action, provides:
A noncustodial parent is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation might:
(1) endanger the child's physical health and well-being; or
(2) significantly impair the child's emotional development.
Mother argues that Father was given "reasonable visitation rights" as required by Ind.Code § 31-14-14-1 because Father was given visitation in accordance with the Indiana Parenting Time Guidelines. Therefore, according to Mother, because Father received reasonable visitation rights, the trial court did not need to make any findings regarding endangerment or impairment before it restricted Father from allowing V.A.M.C. to interact with Rohrs.
We disagree with Mother's approach. In this context, the question of whether Father received reasonable visitation rights is not separate from the question of whether Father's visitation was unreasonably restricted. See, e.g., Marlow v. Marlow, 702 N.E.2d 733, 735-736 (Ind.Ct.App. 1998), trans. denied; Pennington v. Pennington, 596 N.E.2d 305 (Ind.Ct.App. 1992), trans. denied. If the trial court restricted Father's visitation with unreasonable conditions, then Father's visitation rights would be unreasonable. See, e.g., Downey v. Muffley, 767 N.E.2d 1014, 1021 (Ind.Ct.App.2002). Consequently, we turn to Father's arguments regarding the validity of the trial court's restriction.
Father claims that the trial court's order was an abuse of discretion because the trial court exceeded its authority under Ind.Code § 31-14-14-1 when it placed a restriction on Father's visitation without a finding that V.A.M.C.'s physical or emotional health was endangered. Father is correct that the trial court did not find that V.A.M.C.'s physical health or emotional well-being would be damaged by exposure to Rohrs during visitation with Father. While there may have been evidence to support such a finding in the Record, our standard of review prohibits us from affirming this judgment based on anything other than the findings provided by the trial court. See In re J.A.C., 734 N.E.2d at 1059.
Father is also correct that Ind.Code § 31-14-14-1, by its plain language, requires the trial court to make a finding of physical endangerment or emotional impairment prior to placing a restriction on the noncustodial parents visitation. Because the trial court did not specifically find that V.A.M.C.'s emotional well-being or physical health would be endangered by Rohrs's presence, the trial court's findings do not support the restriction. See Downey, 767 N.E.2d at 1021; compare Marlow, 702 N.E.2d at 735-736; Pennington, 596 N.E.2d 305; Sills, 663 N.E.2d at 1215. Consequently, we must reverse the portion of the trial court's order that prohibits Father from associating with Rohrs while *1002 visiting with V.A.M.C.[5]See Downey, 767 N.E.2d at 1021; see, e.g., Teegarden v. Teegarden, 642 N.E.2d 1007, 1010 (Ind.Ct. App.1994) (holding that "without evidence of behavior having an adverse effect upon the children, we find the trial court had no basis upon which to condition Mother's custody of her sons").
As a final matter, Mother requests that we remand this cause to the trial court for a ruling on her petition for appellate attorney's fees. Article 14 of Title 31 of the Indiana Code governs paternity actions. Ind.Code § 31-14-18-2(a) provides:
The trial court may order a party to pay:
(1) a reasonable amount for the cost to the other party of maintaining an action under this article; and
(2) a reasonable amount for attorney's fees, including amounts for legal services provided and costs incurred, before the commencement of the proceedings or after entry of judgment.
That statute permits a party to recover appellate attorney's fees. In re A.J.R., 702 N.E.2d 355, 363 (Ind.Ct.App.1998). A trial court has discretion to determine whether to award attorney's fees, and we review the trial court's decision for an abuse of that discretion. Id. at 364. Consequently, on remand, the trial court should determine whether Father should pay Mother's appellate attorney's fees and, if so, how much of those fees he should pay. See O.S. v. J.M., 436 N.E.2d 871, 873 (Ind.Ct.App.1982) (remanding to the trial court for a determination of who was responsible for mother's legal fees as between a mother and father in a paternity action).
Because the trial court's grant of sole custody to Mother was not clearly erroneous, we affirm that portion of the trial court's order. However, because the trial court's findings did not support the visitation restriction, we reverse that portion of the trial court's order. We remand for the trial court to consider Mother's request that Father pay her appellate attorney fees.
Affirmed in part, reversed in part, and remanded.
FRIEDLANDER, J., and BROOK, C.J. concur.
NOTES
[1] In her appellee's brief, Mother moves to strike the statement of the facts from Father's Brief because Father failed to present the facts in accordance with the required standard of review. Because the standard of review when a trial court has entered specific findings and conclusions pursuant to a party's request requires us to view the evidence in the light most favorable to the trial court's judgment, we ignore all portions of Father's fact statement and of the Record that do not conform to that standard. Consequently, we need not explicitly grant Mother's motion to strike. Nevertheless, we caution Father's counsel that future failures to follow the Appellate Rules could result in more severe action by this Court. See, e.g., Catellier v. Depco, Inc., 696 N.E.2d 75, 78-80, n. 5 (Ind.Ct. App.1998) (noting that failure to follow the appellate rules can result in waiver of an appeal and assessing appellate attorney fees against appellate counsel).
[2] According to Father's testimony, "experts in Ohio" told him about the sphincter test. Appellant's Appendix at 96. Supposedly, a normal sphincter, if it is touched or exposed to air will "pinch up tight." Id. In contrast, a sphincter that has been penetrated or abused will not pinch up tight. Id. Father claimed that he conducted this test on V.A.M.C. by exposing her sphincter to air when he changed her diaper.
[3] PAS is a theory described in a 1992 selfpublished book by Dr. Richard A. Gardner, M.D. Hanson v. Spolnik, 685 N.E.2d 71, 84 (Ind.Ct.App.1997) (Cheezem, J., concurring and dissenting). PAS is a child disorder that can arise during child custody disputes. Id. The theory describes "a situation where children are not merely systematically and consciously `brainwashed', but are also subconsciously and unsubconsciously `programmed' by one parent against the other parent." Id. (quoting RICHARD A. GARDNER, THE PARENTAL ALIENATION SYNDROME 59-60 (1992)).
[4] The custody and visitation issues discussed in Hanson occurred pursuant to the dissolution of a marriage. Hanson, 685 N.E.2d at 74. However, we may consider case law holdings on custody and visitation made in dissolution proceedings when determining issues related to custody and visitation in paternity proceedings because in both types of cases the predominant concern is the best interests of the child. See In re Joe, 486 N.E.2d 1052, 1055 n. 1 (Ind.Ct.App.1985).
[5] Because we reverse the portion of the trial court's order that places a restriction on Father's visitation because that restriction was an abuse of discretion, we need not address Father's argument that the restriction violated his constitutional right to free association.