## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 25 2017, 10:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

William Joseph Carlin, Jr.
Kruse & Kruse, PC
Auburn, Indiana

ATTORNEY FOR APPELLEE

Adam C. Squiller
Squiller & Hamilton, LLP
Auburn, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Roxanne Wells,

*Appellant-Respondent,*

v.

Wayne Wells, III,

*Appellee-Petitioner.*

September 25, 2017

Court of Appeals Case No.
17A03-1701-DR-172

Appeal from the DeKalb Superior
Court

The Honorable Allen N. Wheat,
Special Judge

Trial Court Cause No. 17D01-
0612-DR-149

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, Roxanne Wells (Mother), appeals the trial court's Order, modifying the custody of her minor child, W.E.W. IV (Child), in favor of Appellee-Petitioner, Wayne Wells III (Father).

We reverse.

# ISSUES

Mother raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion in admitting certain evidence; and

(2) Whether the trial court abused its discretion by granting Father sole physical and legal custody of the Child.

# FACTS AND PROCEDURAL HISTORY

The parties were married on June 18, 2004, and divorced on June 6, 2006. Through a mediated settlement agreement, the parties agreed to share joint legal custody of the Child, who was born on January 25, 2005, with Mother having physical custody. Father was to exercise parenting time in accordance with the Indiana Parenting Time Guidelines (Guidelines). Father later remarried, and is currently living with his wife and her ten-year old son in Garrett, Indiana.

On June 21, 2012, through another mediated settlement agreement, the parties agreed on a split parenting time schedule, which allowed the Child to spend equal time with both parents, resulting in a *de facto* joint physical custody. In addition, the mediated agreement stated that the parties shall have additional parenting time; extended parenting time of ten days each summer; and that the Child shall continue to be seen by Fort Wayne Pediatrics and Auburn Pediatric Dentistry. On April 8, 2014, Mother was found to be in contempt of court for failing to sign an IRS form so that Father could claim the Child as an exemption on his tax returns. Also, on December 12, 2014, Mother was found to be in contempt of court for taking the Child to a dentist other than the one agreed to by the parties in the mediated settlement agreement of June 21, 2012.

On May 27, 2015, Father filed a Verified Petition for Rule to Show Cause and Motion to Impose Incarceration Sanction, alleging that Mother had switched the Child's doctor to another doctor not part of the Fort Wayne Pediatrics. Also, on the same day, Father filed a Verified Petition to Modify Custody, alleging that Mother was placing the Child in the middle of their parenting time disagreements. Father claimed that it is in the Child's best interest to be awarded sole legal and physical custody of the Child.

On August 25, 2015, the trial court appointed Hugh Taylor as the guardian *ad litem* (GAL Taylor). Although Mother was represented by an attorney at the time, on September 15, 2015, Mother filed a letter with the trial court seeking removal of GAL Taylor because GAL Taylor was the step-father-in-law to Father's attorney on record. The trial court forwarded the letter to Mother's

counsel on record, but did not schedule a hearing or appoint a different GAL at that time. On January 11, 2016, GAL Taylor filed his report with the trial court. On January 13, 2016, Mother's attorney, Anthony Kraus (Attorney Kraus) withdrew, and Harry Foster (Attorney Foster) entered his appearance for Mother on January 19, 2016. Attorney Foster also filed a petition to set aside GAL Taylor's appointment. A hearing was held on February 25, 2016. and GAL Taylor was terminated as GAL and Kim Shoup (GAL Shoup) was appointed. On April 7, 2016, Father's counsel took GAL Taylor's deposition since GAL Taylor was in failing health and it was anticipated that he would not be available to testify at the upcoming custody modification hearing. Mother's counsel, Attorney Foster, chose not to attend the deposition since GAL Shoup had been appointed as the GAL on the case, and he believed that GAL Taylor's testimony at the deposition was not relevant. On May 2, 2016, GAL Taylor passed away. On May 26, 2016, GAL Shoup filed his report with the trial court. On May 27, 2016, Mother's counsel filed a Verified Petition for Contempt and Request for Attorney Fees, where she alleged that Father had relocated from his primary residence without notifying the trial court.

[8] On June 1, 2016, the parties convened for a pretrial hearing on Father's Verified Petition to Modify Custody and Verified Petition for Rule to Show Cause and Motion to Impose Incarceration Sanction; and also for Mother's Verified Petition for Contempt and Request for Attorney Fees. Before the hearing, Mother filed a Motion in Limine, seeking to exclude GAL Taylor's report filed with the trial court on January 11, 2016, and GAL Taylor's testimony given at

a deposition. Over Mother's objection, in determining Mother's Motion in Limine, the trial court heard the testimony of Attorney Kraus, Mother's former counsel. Attorney Kraus, who had been called by Father, testified that prior to the appointment of GAL Taylor, the parties had discussions with the trial court and they all agreed to the appointment of GAL Taylor. Attorney Kraus specified that he was aware that GAL Taylor was the step-father-in-law to Father's attorney, and he further stated that Mother was concerned with respect to the familial relationship. Attorney Kraus further stated that during a brief meeting he had with Mother following the appointment of GAL Taylor, he informed Mother that he personally knew GAL Taylor and he believed GAL Taylor would do a "fair job and . . . be impartial" as a GAL. (Tr. Vol. II, p. 11). Attorney Kraus finally stated that had Mother expressed her distrust regarding GAL Taylor, he would have filed a petition to remove GAL Taylor. Midway through the pretrial hearing, the presiding judge recused himself upon learning his son had recently married the daughter of Father's next witness.

[9] Following the removal of GAL Taylor, on May 26, 2016, GAL Shoup filed his report with the trial court. GAL Shoup indicated that prior to making his report, he read the court file, the depositions of Father, Mother, and prior GAL Taylor. GAL Shoup also stated that he visited Father's and Mother's homes, spoke with the parties, the Child, and the parties' attorneys. In his report, GAL Shoup noted that Father, Father's wife, and wife's son, had recently moved to a two-story house in a rural setting, and although Father's house was "warm, welcoming, and very child appropriate," the Child did not "know any kids in

the area to play with." (Appellant's App. Vol. II, p. 78). As for Mother's home, GAL Shoup stated that it was a single-story house, where the Child had a nice bedroom and there was plenty of room both inside and outside to play. GAL Shoup noted that the Child's friends live in Mother's current neighborhood and he played with them frequently. At the end of his report, GAL Shoup recommended:

> A change in custody would not be in [the Child's] best interest. He does not want it to change (except for expanded Sunday visits with his mother). Changing the present arrangement would not make things better for [the Child]. The hardship on [the Child] is the vicious combativeness of the parents. A court order can't change that-only the parents can.

(Appellant's App. Vol. II, p. 78). On August 3, 2016, a special judge was appointed, a pre-trial conference was held on August 10, 2016, and a final two-day hearing for all pending motions was set for January 5, 2017.[1] An evidentiary hearing was held on January 5-6, 2017, on the parties competing motions. During the custody modification hearing, Father stated that he is employed at Steel Dynamics in Butler, Indiana, as a departmental head, works from 8:00 a.m. to 4:00 p.m., Monday through Friday, and earns a yearly income of about $105,000. According to the mediated settlement agreement

---

[1] On January 3, 2017, Father filed yet another Verified Petition to Show Cause, alleging that Mother had failed to reimburse him for medical expenses, and that she had violated the holiday parenting time schedule. At the start of the custody modification hearing, the trial court determined that a hearing on Father's January 3rd petition would be scheduled for a later date.

entered by the parties in 2012, the parties had equal parenting time. Father testified that he had parenting time every Sunday (from 4:00 p.m.), and Wednesday (from 4:15 p.m.). Father also had parenting time every other Thursday beginning at 4:15 p.m. Father testified that he and Mother "don't see eye to eye" regarding the Child's extracurricular activities. (Tr. Vol. II, p. 80). Father stated that the Child, who was in middle school, was on the wrestling team, and his coach had offered the Child an opportunity to practice wresting with high school students. The practice was every day after school. Father claimed that Mother had initially intimated that she would not take the Child to practice during her parenting time. When asked about Mother's opinion regarding the Child being too involved in sports, Father stated the Child's overall grade had not been affected by sports. Father also stated that Mother had refused to register the Child for football because she found it expensive. Notwithstanding Mother's refusal, Father signed up the Child for football, paid the registration fees, and bought the Child the required gear. Father indicated that Mother had initially stated that she would not allow the Child to attend the football games, however, he testified that Mother did in fact take the Child to the games. Father also accused Mother of allowing the Child to call Father regarding the scheduling of parenting time. Specifically, Father testified that the Child called him once on Friday at around 10:00 p.m. and requested to go to a birthday party on Saturday 3:00 p.m. Father alleged that the birthday party conflicted with the Child's first football game of the season which was scheduled for 4:00 p.m. Father stated that he was dissatisfied with Mother's actions of allowing the Child to call him directly regarding the request. Father

also asserted that Mother had denied him the right to exercise his right of first refusal on at least one occasion while she was at work. Father added he had repeatedly requested Mother's work schedule so that he could plan for additional parenting time, but Mother had continually refused to comply with his demands. Father indicated that the current parenting time schedule is not working, "especially now with him being in sports and the arguing over whether he's supposed to be, whether he's supposed to go to practice or whether he's not supposed to go to practice. Or, uh, just how much we disagree about it." (Tr. Vol. II, p. 131).

[10] Mother testified that she works two part-time jobs at Subway and Steak 'n Shake in Auburn, Indiana. At Subway, Mother works from 10:00 a.m. to 3:00 p.m. on Thursday and Friday, and every Sunday night from 5:00 p.m. to 10:30 p.m., with a pay of $9.50 per hour. At Steak 'n Shake, Mother works as a server for $2.00 an hour plus tips, every Monday and Tuesday morning, every Wednesday night, and every other Thursday night. During the times that Mother works, Father exercises parenting time with the Child. Regarding the Child's extracurricular activities, Mother testified that Child's wrestling practice was from 6:00 p.m. to 8:00 p.m. every Tuesday and Thursday. Based on the parenting time schedule, Mother took the Child to most of the wrestling practices. In addition to the Tuesday and Thursday two-hour wrestling practice, the Child was required to have an additional everyday practice from 3:30 p.m. to 5:30 p.m., Monday through Thursday. Based on the intense wrestling schedule, Mother expressed her concern to Father that the Child

would be at school from 7:30 a.m. until 8:00 p.m., and the Child had no time to eat or do homework in the evenings. As such, on Mondays, when the Child was home with Mother, she did not allow him to go to wrestling practice. As for football, Mother testified that she was at first reluctant to allow the Child to play football since he was young and she wanted "his body [to] grow a little bit so that he didn't break anything." (Tr. Vol. II, p. 180). Notwithstanding her reservations, Mother allowed the Child to play football and she took him to his games. Aside from Father's claim that the Child missed his first football game of the season, Mother stated that it "was like a recognition in the middle of the, . . . high school game, where they were just like announcing the players." (Tr. p. 181). Mother stated that she has never refused to take the Child to any of his football games, and that the only reason the Child missed some games was due to an injury.

[11] GAL Shoup testified that testimony given by the parties did not change his recommendation as stated in his report filed with the trial court in May 2016, indicating that custody of the Child should remain unchanged. When asked why Mother's prior contempt orders of 2014 did not influence his recommendation, GAL Shoup stated that he did not ascribe much weight to Mother's contempt orders, and he focused more on the personality of the parties. When questioned if Mother was trying to destroy Father's relationship with the Child, he responded:

> Let me answer that by saying no. However, I think the, well, if I may extemporize a bit, Your Honor. [The Child] has progressed through first grade, second grade, all the elementary grades,

where he learned to color, print his name, count, on up through third grade and fourth grade, reading, dealing with children on the playground, dealing with authority figures in, and teachers, uh, and generally developing as a, as a young person. He's now in middle school with its set of challenges, social and scholastic. He will, I'm confident, graduate and, uh, I would hope go on to college where he may wrestle for Purdue, or play basketball [] or go to art school. No one has mentioned his fine artistic ability, which struck me. . .quite strongly. The background of his past, present and future is going to be the discord and unhappiness between his parents, both of whom he loves and both of whom love him. I thought the most poignant testimony today was when [Father] mentioned that he was the child of divorce and he didn't elaborate but, I detected a catch in his voice that told me that that affected him and it still affects him as a man today. How, I don't know. But I do know that [the Child] will be affected by this and it should stop. I don't see any reason why it shouldn't stop other than the two parties that are involved. The last sentence of my Guardian [*Ad Litem*] Report is that no court order is going to bring peace to this family, only the parents can. [The Child] can't do it. He's going to experience whatever his parents provide for him. So, the boy would be happy living with [F]ather, in [F]ather's home. He is happy living with [M]other in [M]other's home. He told me he doesn't want any change except, I guess there was, he wanted an expanded Sunday visit that was alluded to some extent here. I mentioned that in my report. I notice in [GAL Taylor's] report, the [Child] told [GAL Taylor] the same thing. [The Child] didn't necessarily want anything to change. He's [] satisfied with the going back and forth. And I do feel bit like [a] Pollyanna saying just, come on people. Get along. Let this [Child] have some quiet. But that's, that's how I feel. I'm here representing him. I imagine him sitting beside me here in court today Judge. None of this would surprise him. He, he knows this. He knows what's going on. He's 11 years old. He's doing his best to deal with it and thankfully it hasn't manifested itself in, you know, negative behavior which sometimes it does. I'm very glad to hear he

seems well adjusted and has friends and interests. Those three things will sustain him but, these two parents could help by swallowing hard and getting along.

(Tr. Vol. II, pp. 234-35). During cross examination, GAL Shoup was asked whether Mother's actions have "unnecessarily put [the Child] in the middle of conflict between the parents" and GAL Shoup stated that "I would not characterize it as Mother's actions so much as probably the way [the Child] sees it as his parents just not getting along." (Tr. Vol. II, pp. 236-37). When asked whether it was a good idea for the Child to call Father directly about attending a birthday party, GAL Shoup testified, "I understand the suggestion that making the child be the go-between is at first . . . not a good idea. But on the other hand, the way [Mother] expressed it saying, you know, you're welcome to stay over but your [Father] is gonna have to approve of it." (Tr. Vol. II, p. 237).

[12] At the close of the evidence, the trial court took the matter under advisement. On January 18, 2017, the trial court issued its Order on the parties' motions. Specifically, the trial court denied both Father and Mother's contempt motions regarding Father's relocation contrary to the relocation statute, and Mother's actions of changing the Child's family doctor to a doctor not a part of the Fort Wayne Pediatrics. With regards to Father's petition to modify custody, the trial court granted Father sole legal and physical custody of the Child, subject to

Mother's parenting time in accordance with a Parallel Parenting Time Order which it issued on the same day.[2]

[13] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

[14] We initially address Mother's contention that the trial court abused its discretion by admitting GAL Taylor's report. Mother claims that GAL Taylor's report was no longer relevant since he was not the appointed GAL at the time of the custody hearing. Father asserts that Mother has waived this argument for appellate review since she is raising it for the first time on appeal.

[15] The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*. An abuse of discretion only occurs where the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id*. "The fact that evidence was erroneously admitted does not automatically require reversal, and we will reverse only if we conclude the admission affected a party's substantial rights." *Id*. "In general, the admission of evidence that is merely cumulative of other

---

[2] Effective March 2013, a provision allowing for the creation of Parallel Parenting Orders was added to the Parenting Time Guidelines. Such orders are intended to minimize the contact between "High conflict parents" who demonstrate a pattern of ongoing litigation, chronic anger and distrusts, inability to communicate about and cooperate in the care of the child or other behaviors placing the child 's wellbeing at risk. Ind. Parenting Time G., § IV (1). The Parallel Parenting provision also states, "Joint legal custody of children is normally inappropriate in parallel parenting situations." Id.

evidence amounts to harmless error as such admission does not affect a party's substantial rights." *In re Paternity of H.R.M.*, 864 N.E.2d 442, 450-51 (Ind. Ct. App. 2007).

First, we must review if Mother has waived this argument on appeal. Mother's motion in limine to preclude GAL Taylor's report was raised prior to the custody modification hearing, the trial court conducted a hearing on Mother's motion, and it denied the motion. During the custody modification hearing, Mother did not raise a similar objection. We note that a ruling on a motion in limine is independent from the admission of evidence at trial. *Perez v. Bakel*, 862 N.E.2d 289, 295 (Ind. Ct. App. 2007) ("[I]t is well-settled that in order to preserve error in the denial of a pretrial motion in limine, the appealing party must object to the admission of the evidence at the time it is offered."). Since Mother failed to renew her objection regarding the admission of GAL Taylor's report at the custody modification hearing, we conclude that she has waived her claim regarding its admissibility.

## II. *Modification of Custody*

### A. *Standard of Review*

Child custody modifications are reviewed for an abuse of discretion and we grant latitude and deference to our trial judges in family law matters. *Miller v. Carpenter*, 965 N.E.2d 104, 108 (Ind. Ct. App. 2012). On appeal, we neither reweigh the evidence nor reassess witness credibility. *Id*. Rather, we consider

only the evidence most favorable to the judgment and the inferences flowing therefrom. *Id.*

[18] Here, the trial court entered findings of fact pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. Ind. Trial R. 52(A); *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000). In our review, we first consider whether the evidence supports the factual findings. *Menard*, 726 N.E.2d at 1210. Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. T.R. 52(A). While we defer substantially to findings of fact, we do not do so to conclusions of law. *Menard*, 726 N.E.2d at 1210. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999).

[19] Further, in this case the trial court entered special findings in the fact-finding order *sua sponte*. When a trial court makes specific findings upon its own motion, the general judgment will control as to the issues upon which the court has not found and specific findings control only as to the issues they cover. *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013) (citation omitted), *trans. denied.* Thus, it may not be necessary that each and every special finding be

correct, and even where one or more special findings are clearly erroneous, the judgment may be affirmed if the judgment is supported by other findings or is otherwise supported by the record. Where, as here, special findings are entered *sua sponte*, the general judgment will be affirmed if it can be sustained upon any legal theory by the evidence introduced at trial. *Id*. While special findings entered *sua sponte* control as to the issues upon which the court has found, they do not otherwise affect our general judgment standard of review, and we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court. *Id*. Mother contends that the trial court abused its discretion by modifying physical and legal custody of the Child with Father. We will address each issue in turn.

## B. *Physical Custody*

Mother contends that the trial court abused its discretion in modifying the custody by granting Father primary physical custody of the Child. Our legislature has defined the circumstances under which a custody order may be modified, providing in relevant part:

> (a) The court may not modify a child custody order unless:
>
> (1) the modification is in the best interests of the child; and
>
> (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 . . . of this chapter.

(b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.

Indiana Code Section 31-17-2-21. Indiana Code Section 31-17-2-8 specifies that a trial court is to consider all relevant factors, including:

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a [*de facto*] custodian . . . .

[21] In the order granting Father's petition to modify custody, the trial court entered the following pertinent findings:

32. Applying the non-exclusive list of factors [in Indiana Code section 31-17-2-8] to be considered by a court when making a custody determination to the facts of the case at bar the [c]ourt finds as follows:

a. The age and sex of [the Child] do not favor awarding his custody to Mother as opposed to Father, or [*vice versa*].

b. Father wants sole custody. Mother wants sole custody but would be content with the present arrangement remaining in effect with some modifications of parenting times.

c. [The Child] did not testify at trial, nor did the [c]ourt interview [the Child] in-camera.

d. [The Child] interacts appropriately with both Mother Father. [The Child] interacts appropriately with his stepmother and stepbrother. No evidence was presented to the [c]ourt reference to [the Child's] interaction with extended family members.

e. [The Child] has adjusted to the homes of Mother and Father, his school and community.

f. There are no issues in this case pertaining to the mental and/or physical health of Mother or Father.

g. There is no evidence in this case regarding a pattern of domestic or family violence by either Mother or Father.

33. In addition to those factors set forth above and considered by the [c]ourt there has been filed with the [c]ourt two (2) Guardian [*Ad Litem*] reports. The report of one Guardian [*Ad Litem*] recommends that the care, custody and control of [the Child] be set aside to Father. The report of the second Guardian [*Ad Litem*] recommends that the status quo be maintained with some adjustments being made to the parenting times.

34. Based upon the above [] analysis, the [c]ourt concludes that Father has proven by a preponderance of the evidence that it would be in the best interest of [the Child] if [the Child's] care, custody and control was set aside to Father.

(Appellant's App. Vol. II, p. 27). When evaluating whether a change of circumstances has occurred that is substantial enough to warrant a modification of custody, the context of the whole environment must be judged, "'and the effect on the child is what renders a change substantial or inconsequential.'" *Sutton*, 16 N.E.3d at 485 (quoting *Jarrell v. Jarrell*, 5 N.E.3d 1186, 1193 (Ind. Ct. App. 2014), *trans. denied*).

[22] Mother claims that Father failed to establish a change in circumstances sufficient to support a modification in physical custody. At the custody modification hearing, Father bore the burden of establishing that the existing custody order was unreasonable and should be altered due to a substantial

change in circumstances which has occurred since the date of the previous custody decree and affecting the Child's welfare. *See Cunningham v. Cunningham*, 787 N.E.2d 930, 935 (Ind. Ct. App. 2003). From the above findings, the trial court found that none of the enumerated factors under Indiana Code section 31-17-2-8, favored either party. We agree with Mother that the trial court did not make a finding of a substantial change in circumstances to warrant modification of physical custody. As such we reverse the trial court's order modifying physical custody to Father and the accompanying Parallel Parenting Time Order.

## II. *Legal Custody*

[23] Mother also contends that the trial court abused its discretion by modifying the parties' joint legal custody to sole legal custody to Father.[3] When considering a modification from joint legal custody to sole legal custody, we must determine whether there has been a substantial change in one or more of the factors listed in Indiana Code section 31-17-2-15, in addition to considering any substantial change to the Section 8 factors, as is typically necessary for physical custody modifications. *Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1259 (Ind. Ct. App.

---

[3] In his appellees' brief, Father claims that Mother explicitly failed to challenge the trial court's finding regarding Father's award of sole legal custody. We disagree. In her reply brief, Mother claims that Father failed to read her appellate brief, since she challenged the trial court's Finding 28, where the trial court had found that a joint legal custody arrangement was not feasible due to the parties' continued disagreements regarding the Child's medical and dental care, the scheduling of the Child's extracurricular activities, additional parenting time, the fact that the Child had been put in the middle of the parties' disagreements, and Mother's two contempt orders

2010) (citing *Carmichael v. Siegel*, 754 N.E.2d 619, 635 n. 7 (Ind. Ct. App. 2001)). In determining whether an award of joint legal custody under section 13 of this chapter would be in the best interest of the child, the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint custody have agreed to an award of joint legal custody. The court shall also consider:

> (1) the fitness and suitability of each of the persons awarded joint custody;
>
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
>
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;
>
> (5) whether the persons awarded joint custody:
>
> (A) live in close proximity to each other; and
>
> (B) plan to continue to do so; and
>
> (6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

I.C. § 31-17-2-15. Our courts have reiterated that factor (2), whether the parents are willing and able to cooperate in advancing the child's welfare, is of particular importance in making legal custody determinations. *Julie C.*, 924 N.E.2d at 1260. Where "the parties have made child-rearing a battleground, then joint custody is not appropriate." *Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995). A trial court may modify a custody arrangement if there is a showing of changed circumstances so substantial and continuing as to make the existing custody order unreasonable. *Lamb v. Wenning*, 600 N.E.2d 96, 98 (Ind. 1992). "Indeed, to award joint legal custody to individually capable parents who cannot work together is tantamount to the proverbial folly of cutting the baby in half in order to effect a fair distribution of the child to competing parents." *Swadner v. Swadner*, 897 N.E.2d 966, 974 (Ind. Ct. App. 2008) (quotation omitted).

[24] In the order granting Father's petition to modify joint legal custody to sole legal custody of the Child with Father, the trial court found that:

> 26. Father's Motion to Modify Custody requires of the Court that it undergo a two-step analysis. First, the Court must decide whether joint legal custody remains viable. Second, if joint legal custody no longer remains viable, then this Court must determine whether the sole custody of [the Child] should be set aside to Mother or Father.
>
> 27. The foundation upon which any workable order of joint legal custody is built rests upon the premise that parents are ready, willing and able to communicate with each other in a meaningful

manner regarding what is in the best interest of their child or children.

28.  The testimony of Mother and Father at trial clearly reflects that meaningful communication between them regarding [the Child's] best interests has greatly deteriorated in recent years. There have been disagreements between Mother and Father regarding medical care, dental care, tax returns and [the Child's] participation in extracurricular sporting activities. Further, there have been disagreements over [the Child] being permitted to spend extra time with Mother or Father. In some of these cases, [the Child] has been put in the middle of the disagreement and asked what he would prefer to do. Mother, on two (2) occasions, has been found in contempt of court for her failure to follow court orders.

29.  The Court concludes that Father has proven by a preponderance of the evidence that it is no longer in the best interest of [the Child] for Father and Mother to exercise joint legal custody, and the Court should at this time enter a sole custody order.

(Appellant's App. Vol. II, p. 27).  Father directs us to evidence demonstrating his highly-acrimonious relationship with Mother.  Mother also points to her testimony that tends to place much of the blame for the disagreements on Father.  Mother posits that although she disagreed with Father regarding the Child's medical care, extracurricular activities, and extra parenting time, the parties' discord did not negatively affect the Child.

[25]  At the evidentiary hearing, Father produced evidence of the parties' text messages, where they argued about the Child's medical care, and

extracurricular activities. Regarding disagreements relating to the Child's medical care, the parties had agreed in the 2012 mediated settlement agreement to take the Child to Auburn Pediatric Dentistry. In 2014, the Child needed tooth fillings, but Mother differed with Father about the Child being "gassed" for tooth fillings. (Tr. Vol. II, p. 85). Based on that, Mother took the Child to a different dentist other than Auburn Pediatric Dentistry. Mother's actions led to a contempt order in 2014. Further, there were differences between the parties regarding Mother's actions of including the Child to her Medicaid insurance. The record shows that the Child was a beneficiary on Father's Anthem insurance, however, sometime in January of 2015, Mother applied for Medicaid and she added the Child as a beneficiary. The insurance company informed Mother that as a secondary insurance provider, it would cover the Child's uninsured expenses. During Easter of 2015, the Child broke his arm. Father took the Child to the emergency room, but the doctor could not cast the Child's arm until the swelling went down. Father subsequently directed Mother to call "Fort Wayne Orthopedics," which Mother did, but the hospital redirected Mother to take the Child to "Ortho One" because the Child had Medicaid insurance. (Tr. Vol. II, p. 173). Ortho One put the cast on the Child and Father was billed. Mother thereafter made a follow up appointment with Dr. Camille Smith (Dr. Smith) of Fort Wayne Pediatrics. (Tr. Vol. II, p. 173). However, Dr. Smith's office informed Mother that the Child was considered as new patient because of his Medicaid insurance, and "she wasn't taking any new Medicaid patients." (Tr. Vol. II, p. 173). Mother's actions of adding the Child to her Medicaid insurance, sparked tension between the parties. However, the

record shows that Mother corrected the mistake by letting her Medicaid insurance lapse out and she did not include the Child in her own insurance the following year. Notwithstanding the conflict regarding the Child's insurance, the Child did not see a different doctor other than Dr. Smith of Fort Wayne Pediatrics nor did the Child miss any appointments. There were no further arguments regarding the Child's medical insurance between the parties. In light of the issues surrounding the Child's medical insurance, on May 27, 2015, Father filed a verified petition for rule to show cause, alleging that Mother's actions were a violation of the parties' 2012 mediated settlement agreement. Notably, in the order granting Father sole physical and legal custody, in Finding 23, the trial court found that "[W]hatever issue that may have existed regarding Mother's change of medical providers has now been resolved." (Appellant's App. Vol. II, p. 22). In Finding 24, the trial court further found the Child is being treated by Dr. Smith; and in Finding 26, the trial court concluded that Mother did not knowingly and intentionally violate the parties' 2012 mediated settlement agreement.

[26] Another issue that was greatly contested at the custody modification hearing was the Child's extracurricular schedule. Father stated that he and Mother do not see eye to eye about the Child's wrestling and football activities. The record shows that the parties have fundamentally different views regarding the Child's involvement in extracurricular activities. Specifically, Mother believed that the Child's wrestling practice was so intense and it did not leave room for the Child to eat or do homework in the evenings. As such, in order to give the Child a

break from wrestling practice, on Mondays, Mother did not take him for practice, but she took him on the other days. Father intimated that although the Child's wrestling schedule took up a lot of time, it did not affect the Child's grades at school, and he indicated that he would pull out the Child from sports if his grades dropped. As for football, the Child was eleven-years-old when he was enrolled. Mother was reluctant to allow the Child to play full-tackle football since she believed he was too young. Mother had expressed to Father that she would not take the Child to his football games. Notwithstanding Mother's initial reservations about the Child playing football, she took him to the games.

[27] We note that in a joint custody arrangement, the parents share the authority and responsibility for the major decisions concerning the child's upbringing, including his education, health care, and religious training. *See* I.C. § 31-17-2-17; *Finnerty v. Clutter*, 917 N.E.2d 154, 156 (Ind. Ct. App. 2009). While we acknowledge that it is not unusual for divorcing couples to have disagreements and arguments, this record is devoid of "evidence of fundamental differences in child rearing philosophies, religious beliefs, or lifestyles." *Walker*, 539 N.E.2d at 513. In *Walker*, this court found joint custody appropriate because there was no evidence that the parents had "fundamental differences in child rearing, philosophies, religious beliefs, or lifestyles," and there was evidence that the parents were able to set aside their personal differences for the interests of the children. *Id.*

[28] In the present case, the record is bare of any indications that fundamental differences in child rearing philosophies, religious beliefs, or lifestyles appear to exist between the parties. The evidence presented to the trial court reflects that both parties, for the most part, communicate with respect to the Child's needs. First, we recognize that the quarrels regarding the Child's medical care was surrounded by Mother's actions of adding the Child to her insurance. As noted, Mother corrected the issue by not including the Child in her insurance upon renewal, and more significantly is that the Child was not seen by a different doctor other than Fort Wayne Pediatrics. In fact, in the order granting Father sole legal custody of the Child, the trial court concluded that Mother's actions of adding the Child to her in insurance was not a deliberate violation of the parties' 2012 mediated settlement agreement. With respect to the Child's extracurricular activities, Mother had differing views from Father about the Child's involvement in sports. Notwithstanding her reservations, she took the Child to his scheduled wrestling and football practices. With respect to Mother's two contempt orders in 2014, we find that even if Mother's actions were a violation of the parties' 2012 mediated settlement agreement, our court has previously found that "lack of cooperation or isolated acts of misconduct by a custodial parent cannot serve as a basis for the modification of child custody" whereas "a parent's egregious violation of a custody order or behavior towards another parent, which places a child's welfare at stake, can support" such a modification. *Hanson v. Spolnik*, 685 N.E.2d 71, 78 (Ind. Ct. App. 1997), *trans denied*. Here, Father does not argue that Mother's actions placed the Child's "mental and physical welfare . . . in jeopardy." *Id.* at 79.

[29] In sum, the determinative issue is whether the parties are unable or unwilling to communicate for the best interests of the Child. This case presents a rare example in which we conclude it is necessary to reverse a trial court's decision regarding child custody. We cannot allow a custody modification to stand where there is a lack of evidence to support that ruling. Other than the medical insurance incident, and the parties' disagreements on the Child's extracurricular activities, the record is bare on other fundamental disputes relating to the Child's upbringing. As common with most divorced couples and intact family situations, fundamental decisions relating to a child's upbringing may only be reached after tense exchanges or extended negotiations between the parties. In the instant case, we do not believe that parties have reached a tipping point thereby making the existing joint legal custody arrangement impracticable. As with most matters concerning custody, "[w]e have no way of knowing whether this arrangement will work or not; only time can tell." *Walker*, 539 N.E.2d at 513. Based on the foregoing, we conclude that the trial court's order modifying joint legal custody to sole custody of the Child in favor of Father was clearly erroneous.

## CONCLUSION

[30] Based on the foregoing, we conclude that the trial court did not abuse its discretion by admitting GAL Taylor's report. However, we conclude that the trial court abused its discretion by modifying the prior custody order. Therefore, we reverse the trial court's ruling.

Reversed.

Robb, J. and Pyle, J. concur